No. 71,198

STATE OF KANSAS, *Appellee*, v. LEONARD C. FOSTER, *Appellant.*
(910 P.2d 848)

Opinion filed February 9, 1996.

*Benjamin C. Wood*, of Lawrence, argued the cause and was on the brief for appellant.

*Doyle Baker*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The sole question in this criminal appeal is whether prosecutorial misconduct denied the defendant a fair trial. Leonard

C. Foster appeals from his convictions of rape, aggravated kidnapping, aggravated battery, aggravated sexual battery, and aggravated burglary, claiming that prosecutorial misconduct denied him a fair trial. Finding no reversible error, we affirm.

The defendant gave a detailed videotaped confession admitting his involvement and guilt. His confession is consistent with the statement of events related by the victim, who is referred to as D.M. in this opinion. While there are some discrepancies between the two versions, a review of the video confession when considered with the statement of the victim, presents compelling evidence of the defendant's guilt. The defendant testified at trial; he denied any guilt and argued that his confession was coerced. A detailed statement of facts follows.

Just after midnight in early February 1992 in Wichita, D.M. arrived at her house. As she put the key in her front door lock, she turned and saw a person at the bottom of her steps. The person came at her and threw her onto her stomach. He began beating her on the back of the head with a hard object that felt like a gun. D.M. was able to get a glimpse of her assailant. His face was covered with a mask, such as a race-car driver might wear, and he was wearing large safety glasses. He also had on a big army-type jacket and was carrying a gun and what looked to be a small club.

During the ensuing struggle her assailant began choking her, and she lost consciousness. When she regained consciousness, she had fallen off the porch. The assailant picked her up, threw her back onto the porch, and began hitting her. He then used her keys to unlock her front door and then pushed her into the house.

Once inside the house, D.M. struggled with the assailant and tried to get away, but he pushed her to the ground and tied her hands behind her back. As D.M. was lying on the floor, she saw the assailant take some 3-inch cloth tape from a bag that he was carrying. She testified that the tape looked like the kind commonly used at Boeing, where she worked. The assailant began wrapping the tape around D.M.'s eyes, but the tape would not stick because of the amount of blood on her head. Eventually, the assailant wrapped her head in the tape.

The assailant rolled D.M. onto her back, cut her shirt and bra off, and began fondling her breasts. He pulled off her boots and jeans and placed his mouth on her vagina. Finally, he placed her face-down on the couch and engaged in vaginal intercourse.

D.M. was able to testify that her assailant was short and somewhat fat. She based this description upon her position during the rape and on the fact that the assailant placed her legs around his middle. This general description fit the defendant. Following the rape, the assailant squirted some kind of liquid into D.M.'s vagina. He then poured some liquid over her body. In his confession, the defendant stated that he squirted peroxide into and around her vagina. The assailant left the house, taking her purse.

D.M. managed to free herself. She stumbled over to a neighbor's house. The neighbor testified that D.M. came to his house, that she was badly wounded, and that there was a strong skunk-like odor around her. An ambulance and the police were summoned. D.M. was taken to the hospital, and the wounds to her head required 21 sutures. A rape kit was also performed. According to Dr. Harold Stopp, the examining physician, the rape kit disclosed non-motile sperm in D.M.'s vagina.

While in the hospital, D.M. began to suspect that one of her co-workers might be the man who attacked her because the assailant was wearing safety goggles of the type used at Boeing and had the same kind of tape as that used at Boeing. Further, she felt the assailant was someone she knew because he had not spoken to her, indicating that he was afraid she might recognize his voice. Specifically, D.M. began to suspect the defendant, who worked with her at Boeing, because he had the same short, fat build as her assailant.

D.M. was released from the hospital after 3 days. The next day, the defendant came by D.M.'s house to see her. He told her that he had heard about the attack and had come over to check on her health. D.M. thought this was unusual because she had not been to work, nor had she told any of her acquaintances at work, except her supervisor, about the incident. When she questioned the defendant as to how he found out about the incident, the defendant indicated that one of the inspectors at work had told him.

According to D.M., the defendant asked a number of unusual questions. He inquired as to the jagged cuts on the back of her head and asked when she would be getting her stitches out. Until that time, D.M. did not know the cuts on the back of her head were jagged. She had told no one that she had to have stitches, and the stitches were covered by her hair. The defendant also asked questions about the boots D.M. was wearing the night of the rape. The defendant knew that these boots had been taken by police in a search for evidence. Also, D.M. noted that the defendant seemed nervous during the visit.

D.M. stated that she sometimes worked next to the defendant and described the defendant as "weird." She also stated that the defendant was not very intelligent but likes to act as though he is. She noted that the defendant would get upset with her whenever she mentioned letting her former husband come over to see her children.

After the incident, D.M.'s former husband began staying at D.M.'s house to protect her and look after their two children. Two weeks after the incident, when returning to her home at approximately 1 a.m. with her former husband, D.M. noticed the defendant's truck parked around the corner from her home. Her former husband saw an unidentified person run from D.M.'s driveway and gave chase. D.M. drove her truck to where the defendant's truck was parked, in case the unidentified person was the defendant and he tried to get back to his vehicle. D.M.'s former husband was unable to identify the person running from her driveway.

The defendant was interviewed by Detective Thomas Lee of the Sedgwick County Sheriff's Office. Lee stated that he read the defendant his rights and that the defendant indicated that he had already contacted an attorney but agreed to talk with Lee. According to Lee, the defendant denied any involvement in the attack on D.M. When asked why his truck was later at D.M.'s residence, the defendant advised Lee that the truck had been stolen. The defendant provided hair and blood samples and also gave permission for a search of his home. Detective Lee advised the defendant to stay away from D.M.

Within a few days of this first interview, the defendant returned to D.M.'s home, but D.M. refused to let him in. Detective Chris Moore testified that when D.M. reported that the defendant had come to her home, he called in the defendant to talk to him. When asked why he had gone to D.M.'s house even though he had been instructed to stay away, the defendant answered that he did not remember any such instructions. The defendant also stated that he had received a threatening phone call from a female stating, "[Y]ou want to burn in hell you bastard, for what you did to me, and you better start apologizing." According to Moore, the defendant then admitted to raping D.M.

Moore stated that the defendant told him that he was under a lot of pressure at work. According to Moore, the defendant stated that D.M. was always talking at work about her sexual escapades and that she had talked of using sex as a means to get her way. Moore stated that the defendant admitted raping D.M. and then squirting peroxide into her vagina to try to destroy any evidence. The defendant then gave a detailed videotaped confession admitting his involvement.

At trial, William Allen Hamm, DNA analyzer for the KBI, testified on behalf of the State. In the internal and external samples taken from D.M.'s pubic area, he found that the DNA was similar to and matched the banding pattern of the sample submitted by the defendant. He testified that there was a match between the top band and the second band with the defendant's known sample in both instances. According to Hamm, the probability of another person in the Caucasian population having the same banding pattern was 1 in 100,000.

During cross-examination, Hamm admitted that there was a variation in the numerical values between the standard for defendant and the samples but testified that they were within the "match criteria." Hamm stated that he was not aware of the FBI having any published study on American Indian populations and had no data on Pawnee Indians. The defendant's brother later testified that the defendant is one-eighth Pawnee Indian.

The videotape of the defendant's deposition viewed by the jury is contained in the record on appeal. A viewing of the videotape

reveals that the defendant's version of events on the evening is remarkably similar to the testimony of the victim. The similarity occurs in the sequence of events, the actions taken against the victim by the assailant, and in the details concerning the position of the parties during the actual rape. The defendant claimed that he related only information learned from the detective prior to giving his confession and from the victim during his conversations with her after the rape. The victim denied that she discussed any of the details of that evening with the defendant, and Detective Moore denied discussing any of these details with the defendant before his confession. The confession provides clear evidence of its voluntary nature and fails to disclose any evidence that the confession was coerced.

The defendant called five witnesses who had known him for a number of years and in some instances for all his life. Each of these witnesses testified that the defendant had a reputation for nonviolence, and one witness testified that she had never known the defendant to even have been in a fight. The defendant took the stand and described the pressure he was under at the time of his videotaped confession. He testified that the detective told him that he could help the defendant if the defendant would just admit that he committed the crime. Detective Moore refuted the defendant's claim. The defendant also stated that the detective told him his confession would make D.M. feel better and like him more. The defendant also stated that he did not own a green jacket that D.M. testified her assailant wore and that he did not throw away any evidence, did not have skunk scent, and did not commit the crime.

The defendant identifies four separate instances of prosecutorial misconduct which he claims require reversal of his convictions. Three occurred during the closing argument, and the fourth occurred during the cross-examination of the defendant. We examine each claim with two questions in mind: first, whether such misconduct is present and second, if so, whether the misconduct denied the defendant a fair trial.

The standard of review where a defendant alleges prosecutorial misconduct during closing argument is well settled in Kansas:

" 'Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. [Citation omitted.] The prosecutor is entitled to considerable latitude in arguing the case to a jury. There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel. [Citation omitted.] Since Kansas does not follow the "plain error" rule used in federal courts, reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged. [Citation omitted.] Remarks made by the prosecutor in closing argument are harmless error if the court finds that the error had little likelihood of changing the result of the trial.' [Citation omitted.]" *State v. Sexton*, 256 Kan. 344, 363, 886 P.2d 811 (1994).

In *State v. Lewis*, 238 Kan. 94, 98, 708 P.2d 196 (1985), we listed three factors to be considered in determining whether a new trial should be granted for prosecutorial misconduct:

"First, is the misconduct so gross and flagrant as to deny the accused a fair trial (*i.e.*, are the objectionable statements likely to affect the jurors to the defendant's prejudice)? Second, do the remarks show ill will on the prosecutor's part? Third, is the evidence against the defendant of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors?"

With the above in mind, we examine the specific allegations of the defendant.

(1) The first instance involves the following comments made by the prosecuting attorney during the first part of her closing argument concerning the defendant's contact with an attorney before being questioned by the police:

"MS. PARKER [Prosecutor]: Contacts with the attorney. This was brought out on cross-examination by Mr. O'Hara [Defense Counsel]. When the officers first talked to him, Detective Lee—and Mr. O'Hara clearly brought this out—that this man, Mr. Foster, indicated to Detective Lee, yeah, I will go ahead and talk to you, because I have already contacted an attorney. Now why does this innocent man, Mr. Foster—up until this point he's innocent—for some reason he's decided to go contact a lawyer about this.

"MR. O'HARA: To which I object, Your Honor, and ask for a record. It's an improper comment in front of the jury.

"THE COURT: I will overrule the objection.

"MR. O'HARA: Thank you.

"MS. PARKER: In addition, he contacted an attorney between the conversations, as you recall."

During defense counsel's cross-examination of Detective Thomas E. Lee of the Sedgwick County Sheriff's Department, the following exchanges occurred concerning the defendant's contact with an attorney:

"Q. The defendant waived all his rights?

"A. Yes, sir, he did.

"Q. I think at the time the defendant mentioned that he had an attorney, is that correct?

"A. Yes. He advised he had contacted an attorney, but he would go ahead and talk to us.

"Q. Did he tell you who that attorney was?

"A. No, sir, he did not.

. . . .

"Q. He told you at the time that he came in on the 16th who his attorney was. He said he was Carl Kelly, didn't he?

"A. He told us he did contact an attorney. I didn't know if it was this individual. He mentioned he had an attorney by the name of Carl Kelly, but he did not say that is the individual he talked to."

The defendant argues that the prosecutor's comments during argument were unfair and unreasonable in that the comments suggested that an innocent man would have no need of contacting an attorney. The defendant acknowledges that this does not present a comment by the prosecution on post-arrest silence, but he nevertheless relies upon the case of *State v. Higgins*, 243 Kan. 48, 755 P.2d 12 (1988), a case involving a comment by the prosecution on the defendant's post-arrest silence. In *Higgins*, this court found that a defendant's silence after arrest and receiving *Miranda* warnings could not be used to impeach the defendant at trial and that such use constituted a violation of the defendant's due process rights. 243 Kan. at 51. The defendant argues that the rationale of *Higgins* applies in this case because the prosecution asked the jury to draw an inference of guilt based upon the defendant's exercise of his rights under *Miranda* to retain an attorney.

However, the defendant's reliance upon *Higgins* is misplaced. The reason that post-arrest silence may not be used to impeach a defendant is that the *Miranda* warnings imply that the exercise of the rights contained therein will carry no penalty. As pointed out in *Higgins*, it is fundamentally unfair to use the exercise of those

rights to impeach the defendant. See *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). In this case, the objected-to statements did not refer to the defendant's post-*Miranda* assertion of his right to counsel but referred to the fact that the defendant had already spoken to counsel both before being contacted by the police and between two visits with the police.

The State argues that the prosecutor's remarks were nothing more than a fair comment on the defendant's cross-examination of Detective Lee. It contends that defense counsel's reference to the defendant's consultation with an attorney was not, as contended by the defendant, "purely incidental" but was rather for the purpose of creating the inference that even though the defendant had consulted with an attorney, he had nothing to hide and was willing to speak with law enforcement authorities. According to the State, the prosecutor's closing remarks were an appropriate attempt to show the jury that a different inference could be raised from the defendant's contact with an attorney.

The above argument was not made to the trial court but perhaps may have been the rationale as to why the trial court overruled the defendant's objection. We, however, conclude that the remarks made by the prosecutor were improper and calculated to have the jury draw an inference of guilt based upon the defendant's contact with an attorney. The comments were objectionable, and the defendant's objection should have been sustained. The comments amount to prosecutorial misconduct.

However, the comments were not so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. When these remarks are viewed in the light of the trial record as a whole, and in light of the overwhelming evidence of guilt, we are able to conclude that the error had little likelihood of changing the result. The error is, therefore, harmless error. See *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994), and cases discussed therein.

(2) The defendant claims that the following comment by the prosecutor in closing suggested to the jury that the defendant engaged in other rapes and assaults, even though there was no evidence supporting such remarks:

"And then the clothes, about the black jacket and tennis shoes, to touch on that. You remember about how he said those things when he was asked about what he was wearing, what he said about the tennis shoes, 'that night, that time.' How many times—
"MR. O'HARA: Objection, Your Honor.
"THE COURT: I will sustain the objection.
"MR. O'HARA: Thank you.
"MS. PARKER: You can think about his words, 'You always wonder about that,' and, 'that time.' "

The defendant notes that even after the objection was sustained, the State asked the jury to speculate about the issue of other crimes.

During the trial when the prosecutor was cross-examining the defendant concerning his confession, the following exchange took place:

"Q. Do you remember what you said you were wearing, a black jacket? Do you remember saying that?
"A. Yes.
"Q. And you also said that you were wearing tennis shoes that time. What did you mean, Mr. Foster, when you said you wore tennis shoes that time?
"A. I didn't say no [sic] 'that time.'
"Q. So you're saying that's not on the tape?
"A. I never wore nothing but tennis shoes.
"Q. You said, that time. You said, all I have ever wore was tennis shoes.
"A. All I ever had.
"A. All I'm asking is what you meant by that time?
"A. I don't know.
"Q. Has there been other times?
"A. There has been no other time. Other time of what?
"Q. That you have been after [D.M.] or something like this has happened.
"A. No."

The defendant argues that the prosecutor impermissibly inferred that the defendant had participated in other rapes and assaults. The defendant contends that this inference constituted reversible error.

We have held that "[n]o rule governing oral argument is more fundamental than that requiring counsel to confine their remarks to matters in evidence." *State v. Whitaker*, 255 Kan. at 134. "The stating of facts not in evidence is clearly improper." 255 Kan. at

134. However, in summing up a case, a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence. *State v. Dorsey*, 224 Kan. 152, Syl. ¶ 1, 578 P.2d 261 (1978).

The phrase "you always wonder about that" was a reference to the defendant's answer to a question asked during his videotaped confession about whether he was worried about being caught. The State's comment that "you always wonder about that" was an appropriate comment based upon evidence in the record and therefore did not constitute prosecutorial misconduct.

However, the other comments during argument by the prosecutor might have suggested to the jury that the defendant may have committed similar crimes. To this extent, the comments and question constitute prosecutorial misconduct. We fail to understand why a seasoned prosecutor would risk reversal by injecting such remarks during trial. Such comments are not now, nor have they ever been, sanctioned by this court.

The question remains whether the improper remarks require reversal. We note that the improper remarks were cut off by the trial court. Remarks made by the prosecutor in closing argument are harmless error if the court finds that the error had little likelihood of changing the result of the trial. *State v. Sexton*, 256 Kan. at 363. Our review of the entire record convinces us the error had little likelihood of changing the result of the trial. We conclude that the error is harmless.

(3) The third instance of claimed prosecutorial misconduct during closing argument occurred when the prosecutor stated:

"This is not a game to [D.M.], but I submit to you it's a game to the defense. And one of the things that shows up the fact it's a game, is this. Detective Snyder was asked about the color of these panties. Of all the stuff, [defendant's attorney] puts in these panties . . . . Why? Because it's part of the game. And why? Because it is red. Red. That means maybe [D.M.] deserved this, she so lewd to wear red panties."

At this point, the defendant's attorney objected. The objection was sustained whereupon the State announced: "Everyone is entitled to the integrity of their own body, regardless of the color of

their panties, whether they go dancing. And no one deserves the kind of cruelty that was inflicted on [D.M.]."

Defense counsel's stated purpose for introducing the underwear was to establish through Kelly Robbins, a KBI forensics serologist, that the underwear D.M. was wearing during the incident had no signs of the defendant's blood on them. The State objected to this testimony since the underwear had not been introduced into evidence. The following exchange took place between the KBI serologist and defense counsel:

"Q. When you examined the panties, did you find any blood on there from Leonard Foster?
"A. No, I did not.
"Q. Whose blood did you find on there?
"A. I identified human blood that would be consistent with the known blood sample from [D.M.]"

The suggestion by the State that the defendant introduced the panties to cast D.M. in a bad light is contrary to the evidence and also contrary to the final argument of defense counsel. During final argument, defense counsel did not dispute the fact that the rape occurred, nor did counsel suggest that the victim was lying; but his approach was that the defendant did not commit the acts and that his confession was coerced. The prosecutor's comment on the defense's motives for introducing the panties was inappropriate and may have been error. However, the comment was not misconduct so gross and flagrant as to deny the accused a fair trial. Thus, any error resulting is harmless. Because no evidence supports such a comment and nothing the defendant or defense counsel said during trial would support such a comment, it may be concluded that such a remark tends to undermine the credibility of the prosecutor.

(4) The final instance of prosecutorial misconduct alleged by the defendant occurred during cross-examination of the defendant. The following colloquy occurred:

"[Prosecutor]: Mr. Foster, Detective Moore is not the only person you confessed to, is he?
"[The defendant]: He's the only one.
"[Prosecutor]: How about your psychiatrist?"

Prior to trial, the defendant had served notice of his intent to rely upon an insanity defense and had submitted to a psychological evaluation for the purpose of determining his sanity at the time he committed the crimes. The results of this examination, as required by K.S.A. 1994 Supp. 22-3219(2), were made available to the State. See *State v. Williams*, 20 Kan. App. 2d 185, 190-191, 884 P.2d 755 (1994). At the time the prosecutor asked the above question, the psychologist who had prepared the report had not testified, and the defendant's sanity had not been put in issue. Thus, the defendant's conversations with the psychologist remained privileged. See *State v. Williams*, 20 Kan. App. 2d at 191.

Defense counsel objected and asked for a hearing outside the presence of the jury. The defendant then moved for a mistrial based on the fact that the State had asked about medical testimony that was clearly covered by the psychologist-client privilege. The State argued that the defendant had filed a notice of insanity defense in the case and, therefore, was required by law to produce the reports. The State contended that, as a result, that area was made an issue and any privilege was waived.

After hearing arguments from the parties and conducting some research, the district court stated:

"I am going to find that the privilege existed in this case, the filing of the notice of the intent to rely on insanity did not waive that privilege of the psychologist-client privilege set forth in 74-5323; and the question that was pursued or beginning to be pursued by the state, it then would not be permissible, since it would be getting into a privileged communication. Had this been a physician-patient privilege, on the other hand, I think that it clearly was within a line of questioning the state would be entitled to pursue, because the defendant has raised a question about the confession being coerced and the fact that he may have made other confessions to other individuals, certainly would be relevant and within the scope of direct examination. But it's only because of the privileged communication that prevents the state from inquiring into the area."

The court then determined that the State's question was not so damaging as to require a mistrial. The defendant does not claim on appeal that the trial court abused its discretion by not granting a mistrial, and we do not address this question.

The trial court elected to handle the defendant's objection in the following manner:

"THE COURT: I think the best way to proceed with it at this time, rather than to emphasize what the last question is, for me not to restate it and to point out what the question is; but I will just advise the jury that the defense'[s] objection to the last question is being sustained and that the jury is then admonished to disregard that question from the state. And I think that's the best. we can do at this point without providing further attention to the question that was being asked or any inference from that.

"MR. O'HARA: I understand your ruling. Is there any way I can talk to Mr. Foster back in the library to make sure he understands where we are, what we are doing, so he doesn't get mixed up on the witness stand?

"THE COURT: Five minutes.

"MR. O'HARA: Five minutes."

Upon return of the jury, the court stated:

"When we last left off this morning, the defense had an objection, and I want to advise the jury at this time that the defense'[s] objection is being sustained and the jury is being admonished to disregard the last question that was made by the state. With that, Ms. Parker, you may go ahead and resume with your cross-examination."

The question asked by the prosecution constituted error and was prosecutorial misconduct. However, this does not mean that reversible error was necessarily committed.

The objection to the prosecutor's question was immediate. The only response as noted by the trial court when denying a mistrial was the negative response of the defendant. The trial court sustained the defendant's objection and admonished the jury to disregard the question. We have held that where the trial court sustains an objection and admonishes the jury to disregard the prosecutor's improper comment, reversal is not required unless the remarks are so prejudicial as to be incurable. See *State v. Spresser*, 257 Kan. 664, 672, 896 P.2d 1005 (1995).

Courts looking at other cases in which prosecutors have impermissibly asked questions in privileged areas have generally looked at the circumstances surrounding the questions to determine whether the error was reversible. See *Namet v. United States*, 373 U.S. 179, 186, 10 L. Ed. 2d 278, 83 S. Ct. 1151 (1963). In *Namet*, the Court stated that where such an error is predicated upon the concept of prosecutorial misconduct, the inquiry focuses on the conscious attempt of the prosecution to build its case out of infer-

ences arising from the use of testimonial privileges. 373 U.S. at 186. We have also determined that the absence of bad faith on the part of the prosecutor is an important consideration in the determination of whether conduct is prejudicial. *State v. Basker*, 198 Kan. 242, 244, 424 P.2d 535 (1967). In *State v. Lewis*, 238 Kan. 94, 98, 708 P.2d 196 (1985), we indicated that an appropriate question to ask in similar circumstances is whether the "remarks show ill will on the prosecutor's part."

The record in this case indicates no conscious attempt by the State to force the defendant to assert his privilege in order to build a case from the inference created by the invocation of the privilege. Instead, the record demonstrates that the State believed, although mistakenly, that the disclosure of the defendant's psychological evaluation as part of the required disclosure for a possible insanity defense constituted a waiver of the privilege. There is nothing in the record to indicate that the State acted in bad faith. After a timely objection was imposed, the State made no further attempts to inquire in this area. The trial court sustained the objection and admonished the jury to disregard the question posed by the prosecutor.

Moreover, the record contains direct and overwhelming evidence of the defendant's guilt. Under all these circumstances, we conclude that the question posed by the prosecution had little likelihood of changing the result of the trial. Accordingly, the error is harmless.

In conclusion, we do not condone the instances of prosecutorial misconduct in this case. However, the defendant was not denied a fair trial. In light of the overwhelming evidence of guilt, including the defendant's confession and the DNA evidence, the misconduct was harmless error.

Affirmed.

SIX, J., concurring and dissenting: I concur in the result. I write separately to distance myself from the majority's conclusion that the State's comments during closing argument arising from Foster's cross-examination of Detective Lee amounted to prosecutorial misconduct.

The prosecutor's remarks were fair comment. Foster opened the door on cross-examination. For continuity, I repeat Lee's cross-examination by Foster's counsel:

"Q. The defendant waived all his rights?
"A. Yes, sir, he did.
"Q. I think at the time the defendant mentioned that he had an attorney, is that correct?
"A. Yes. He advised he had contacted an attorney, but he would go ahead and talk to us.
"Q. Did he tell you who that attorney was?
"A. No, sir, he did not."

The cross-examination turned to a variety of questions concerning Lee's interview with Foster. Defense counsel then again pursued the attorney inquiry:

"Q. He told you at the time that he came in on the 16th who his attorney was. He said he was Carl Kelly, didn't he?
"A. He told us he did contact an attorney. I didn't know if it was this individual. He mentioned he had an attorney by the name of Carl Kelly, but he did not say that is the individual he talked to."

The State concludes that defense counsel's cross-examination was not "purely incidental" but intended to infer that the defendant had nothing to hide and was willing to speak with the authorities although he had consulted an attorney. The State's conclusion may or may not be correct. The State may place any reasonable inference on the evidence.

The State is entitled to use every legitimate means to effect a just conviction. *State v. Gauger*, 200 Kan. 515, 520, 438 P. 2d 455 (1968). A prosecutor is allowed in closing argument to draw reasonable inferences from the evidence. *State v. Dorsey*, 224 Kan. 152, Syl. ¶ 1, 578 P. 2d 261 (1978). We have allowed considerable latitude in the discussion and analysis of the evidence. *State v. Baker*, 219 Kan. 854, Syl. ¶ 9, 549 P. 2d 911 (1976); see Johnson and Southard, Prosecutorial Misconduct in Closing Argument: Does Harmless Error Mean Never Having to Say, "Reversed"? 49 J.K.B.A. 205, 212 (1980).

The comment here was neither on the defendant's silence nor on matters outside the record, nor were the remarks vituperative

or designed to appeal to the passions of the jury (all clearly inappropriate). The majority has departed from a recognized litigation rule. If you open the door, you invite in fair comment. See *State v. Johnson*, 21 Kan. App. 2d 576, 579, 907 P.2d 144 (1995) (Defendant's unsolicited remarks during direct examination emphasizing that he was telling the truth "opened the door" for cross-examination as to prior convictions involving dishonesty.). Defense counsel's cross-examination opened the door, inviting fair comment from the State on the inferences to be drawn from Foster's attorney contact. See *U.S. v. Spivey*, 859 F.2d 461, 465 (7th Cir. 1988) (government's remarks in closing concerning character and credibility of defendant were not improper; defendant invited the argument by calling four witnesses to testify as to defendant's reputation for honesty). The trial judge was correct in overruling defendant's objection during the State's closing. The prosecutor confined her remarks to a matter introduced in evidence by defendant. See *State v. Whitaker*, 255 Kan. 118, 134, 872 P. 2d 278 (1994).

MCFARLAND, C.J., joins in the foregoing concurring and dissenting opinion.