No. 91,727

STATE OF KANSAS, *Appellee*, v. ERIC BROWN, *Appellant*.

(118 P.3d 1273)

Opinion filed September 9, 2005.

*Sarah Ellen Johnson,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Lee J. Davison,* assistant attorney general, argued the cause, and *Phill Kline,* attorney general, was with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: A jury convicted Eric Brown of felony murder and attempted robbery. We reverse his convictions, finding he was denied a fair trial as the result of comments by the trial court. In the disputed comments, the trial court advised the jury that because of concerns for the jurors' safety and security, steps were being taken to prevent further disclosure of the jurors' identities. In the context of this case, we conclude that the trial court did not take adequate precautions to minimize the prejudicial effects of the comments.

The comments were made following jury selection and after the trial court was informed that a witness had been threatened. Although the individual responsible for making the threats had been identified and incarcerated, the court remained concerned for the safety of the jurors. The court decided to refer to jurors only by number from that point forward and asked the parties to turn over any documents which might contain the jurors' names. Brown did not object to the court's decision.

The trial court then informed the jury about the situation, stating:

"Overnight some concerns, as far as security and safety, have developed. Those are being investigated right now, and we're taking every precaution. They involve witnesses, at this particular point, but as a further precaution, insofar as your safety and security is concerned, I've retrieved from counsel and asked them to provide me with any juror list—they keep track of your names and your information, as far as your questionnaires are concerned. I've retrieved and will be retrieving from them anything that identifies you individually as a juror. Likewise, I've taken the Court's copy and those have all been sealed and secured in the clerk's office, and for further purposes, if necessary, I doubt that counsel will really need to be referring to any of you in the future, but as a precaution, I want everyone to sit where you're seated right now, and let's start with the back row, the first juror there, and you'll be one, and I'd just like you to count off so that counsel, we all have another sheet here, and we're going to refer to you by number if we have to refer to you at all . . . .

. . . .

"Now further precaution. I'll advise the public and the participants that if I'm made aware of any leak of any information concerning the identity of a juror, that

will be dealt with as a contempt of Court issue and punishment will be whatever is deemed appropriate, at the time. And that includes public, press, counsel and parties and witnesses."

Brown did not object to the trial court's comments.

Since Brown argues these comments caused prejudice, we must consider the context of the comments and evidence presented. Following the disputed comments, the prosecutor presented the State's opening statement. Within the argument, the prosecutor told the jury:

"[T]he watchword of this investigation [was] fear. People fear for themselves. Fear for their families. There were witnesses that did not come forward until just recently, because of fear. Witnesses that have changed their story, initially denying that Eric Brown was involved, have changed their story to now say that he [was] involved, because of fear."

The prosecutor also stated:

"At the conclusion of the evidence . . . [w]e will stand before you and ask you to be brave like the witnesses that have [come] forward and will testify for you in these next few days, and we'll ask you to be brave like them and return a verdict of guilty on all counts."

The theme of fear was repeated at various times as the prosecutor presented evidence. The principal witness at the trial was Paula Wilson, the wife of victim Doug Wilson. Her testimony at trial was significantly different from the statements she initially gave police and her testimony at the preliminary hearing. She explained to the jury that she had initially lied because she was afraid.

At trial, Paula testified that on Friday, November 9, 2001, she and her husband Doug were driving through Independence in search of crack cocaine. Doug saw Chris Brown, one of Doug's regular cocaine suppliers, and followed Chris and Brown, who is Chris' brother, to South 16th Street. Chris and Brown got out of their vehicle, and Brown ran into a nearby house. Chris came to the driver's side door of Doug's car and sold him a $20 rock of crack cocaine. After Chris walked away, Brown approached Doug's window and told him he wanted his money. Doug held up his wallet, which contained cash from the paycheck Doug had received that day, but refused to give it to Brown. Brown pulled out a gun

and fired three shots into the car, hitting Doug. Although Doug was able to drive away from the scene, he soon collapsed, and Paula then drove him to the emergency room. Doug underwent surgery for his injuries but died within a few hours.

When Paula initially spoke with police, she did not tell police about the drug deal or that Doug had been driving the car because she knew that Doug had no driver's license and she did not want him to get into trouble. She also told police that she could not identify the shooter except to say he was a black male. At trial, Paula explained that she had been "scared for her life" and was reluctant to identify either Brown or his brother because both men knew who she was. Paula stated, "I was afraid if they thought I could really tell who did it, they'd be after me." At different points in her testimony, Paula stated, "I was scared," "I had to protect myself," and that she was afraid of being hurt.

One other eyewitness, Cameron Johnson, who was 15 years old at the time of the shooting, identified Brown as the shooter. Johnson testified that on the day of the shooting, he had been using alcohol and marijuana. That evening, as he was headed toward South 16th Street to try to find more marijuana, he saw Brown firing a gun at a person inside a car. Johnson was asked if he was afraid to testify, and he stated that he feared retaliation.

At least five different witnesses testified they saw Brown with a handgun on the day before or the day of the shooting. One of these witnesses, who testified she saw Brown with a gun on the day of the shooting, heard the shooting, and saw the victim's car leaving the scene but could not identify the shooter's sex or race, was asked by the prosecutor why she did not come forward with information immediately after the shooting. She responded, over Brown's objection, that she was scared.

Other witnesses testified about conversations with Brown during the week following the shooting. Brown told his former lover, Shannon Werner, there had been a shooting on South 16th Street, he and his brother's names were "in it," and that he would be leaving Independence. Virgil Vaughn testified he overheard Brown saying that "he had to smoke the guy" because "he owed him some

money." David Robison testified Brown admitted shooting the victim because he had disrespected Brown's brother.

Bennie Freeman recalled Brown telling him that "[e]verybody was running around making statements on him, and it was all lies, because there wasn't but a couple of people there, him and [his brother]." In addition, over Brown's objection, Freeman was asked about an encounter he and Brown had earlier on the day Freeman testified. Freeman stated Brown was visibly upset and yelled at him, calling him names like "police mother fucker" and "snitch mother fucker." Freeman was asked if he took this as threatening, and Freeman replied, "No." Later, the trial court admonished the jury to disregard the testimony related to this incident.

Other evidence presented as part of the State's case included the testimony of police officers who discovered the victim's wallet lying in the street at the scene of the shooting; the wallet still contained over $500 in cash. Officers also recovered a partial palm print from the driver's front door of Doug and Paula's car, which matched Brown's palm print.

Although Brown did not testify, the jury viewed videotapes of three police interviews of him. While Brown consistently denied committing the murder, he admitted that earlier in the day he had been in the neighborhood where the murder took place.

Brown called one alibi witness, Anthony Taylor, who testified Brown was at his home during the time the shooting took place. Taylor, however, had previously made a statement to an assistant Montgomery County attorney that Brown had admitted shooting the victim. Taylor made this statement while he was incarcerated on a burglary charge and, at trial, explained that he "told them what they wanted to hear to save my own neck."

Brown also called Cameron Johnson's aunt, who testified that Cameron was playing in a park across from her house several blocks away from the shooting when it took place. This testimony cast doubt on whether Cameron could actually have witnessed the shooting from his location.

In closing arguments, the prosecutor returned to the theme of fear. There were numerous references to Paula Wilson being scared. At one point the prosecutor said Paula "was scared out of

her mind of drug dealers. Was she the only witness that said I'm scared, that got on this stand and said I'm scared for my family? Cameron Johnson said the same thing. Other witnesses . . . said the same thing." Later, the prosecutor reiterated that Cameron Johnson was scared.

## Was the Defendant Denied a Fair Trial?

On appeal, Brown argues his substantial rights to a fair trial were prejudiced because of the trial court's actions and remarks. He argues the trial court's comments denied him a fair trial by undermining the presumption of innocence because the remarks implied that he was a dangerous person. In addition, Brown objects to the trial court's determination that it was appropriate to withhold information about the jury. The ruling and remarks are intertwined and will be discussed together.

## Standard of Review

Judicial comments which are not instructions to the jury are reviewed under judicial misconduct standards. *State v. Davidson,* 264 Kan. 44, 51, 954 P.2d 702 (1998). The party alleging judicial misconduct has the burden of establishing that the misconduct occurred and that the conduct "prejudiced the substantial rights of the complaining party. Mere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial. [Citations omitted.]" *State v. Miller,* 274 Kan. 113, 118, 49 P.3d 458 (2002).

An appellate court's review of an allegation of judicial misconduct, which is unlimited, must be based upon the particular facts and circumstances of the case. 274 Kan. at 118. When a defendant's right to a fair trial is alleged to have been violated, the judicial comments are reviewable on appeal despite the lack of a contemporaneous objection. 274 Kan. at 118.

## Analysis

In support of his argument that the ruling and remarks denied him a fair trial, Brown cites several articles and cases which warn that empaneling an anonymous jury may affect the jury's percep-

tion of the defendant by implying that the defendant is dangerous or apt to harass or influence jurors, thereby implicating the defendant's constitutional right to a presumption of innocence. See, *e.g., United States v. Thomas,* 757 F.2d 1359, 1362-65 (2d Cir. 1985); *United States v. Krout,* 66 F.3d 1420, 1426-28 (5th Cir. 1995); *United States v. Ross,* 33 F.3d 1507, 1519-22 (11th Cir. 1994); Abramovsky and Edelstein, *Anonymous Juries: In Exigent Circumstances Only,* 13 St. John's J. Legal Comment. 457 (1999); Margolin and Uelmen, *The Anonymous Jury: Jury Tampering By Another Name?* 9 Crim. Just. 14 (Fall 1994); Annot., *Propriety of, and Procedure for, Ordering Names and Identities of Jurors to be Withheld from Accused in Federal Criminal Trial—"Anonymous Juries,"* 93 A.L.R. Fed. 135.

Empaneling an anonymous jury is viewed as a drastic measure which should be undertaken only under certain limited circumstances. *Krout,* 66 F.3d at 1427. The trial court must balance the need to ensure juror safety against the defendant's right to the presumption of innocence and the ability to conduct an effective voir dire. *United States v. Vario,* 943 F.2d 236, 239 (2d Cir. 1991), *cert. denied* 502 U.S. 1036 (1992). This balancing test is met where (1) there is strong reason to believe the jury needs protection and (2) the court takes reasonable precautions to minimize any prejudicial effects on the defendant and to ensure his or her fundamental rights are protected. *Krout,* 66 F.3d at 1427. "Within these parameters, and, again noting the seriousness of such a step, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." 66 F.3d at 1427.

In general, state courts have followed the federal approach of requiring the trial court to (1) find a compelling reason to believe that the jury needs protection from external sources and (2) take reasonable precautions to minimize any prejudicial effects on the defendant and to ensure the defendant's rights are protected. See, *e.g., Commonwealth v. Angiulo,* 415 Mass. 502, 615 N.E.2d 155 (1993); *State v. Bowles,* 530 N.W.2d 521 (Minn. 1995); *State v. Hill,* 92 Ohio St. 3d 191, 200, 749 N.E.2d 274 (2001); Annot., *Propriety of Using Anonymous Juries in State Criminal Cases,* 60 A.L.R. 5th 39.

Factors which may justify a finding that the jury needs protection include:

"(1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment. [Citations omitted.]" *Krout*, 66 F.3d at 1427.

In applying the second prong of the test — whether there were reasonable precautions to minimize any prejudicial effects — many courts have chosen to instruct the jury that the reason for their anonymity is to prevent the media from interfering with their privacy. See *Thomas*, 757 F.2d at 1364; *United States v. Paccione*, 949 F.2d 1183, 1193 (2d Cir. 1991), *cert. denied* 505 U.S. 1220 (1992). Other courts have described juror anonymity as a precautionary measure designed to ensure both sides receive a fair trial. See *Ross*, 33 F.3d at 1522; *United States v. Crockett*, 979 F.2d 1204, 1217 (7th Cir. 1992), *cert. denied* 507 U.S. 998 (1993). Yet other courts have simply told juries that anonymity is common practice. See *United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994); *Hill*, 92 Ohio St. 3d at 200.

All of these methods are intended to "remove any stigma that might result from the jurors' awareness that unusual measures are being taken to protect their safety." *Anonymous Juries: In Exigent Circumstances Only*, 13 St. John's J. Legal Comment. at 473.

The State points out that this case did not involve the impanelment of a truly anonymous jury panel, since the parties had full access to unedited jury questionnaires during voir dire. It was only after jury selection that the trial court made the decision to identify jurors by number. Thus, the State contends that the situation should not be analyzed under the same legal standards as a truly anonymous jury.

The State's argument is only partially correct. Because the trial court did not order anonymity until after the jury was empaneled, there is no question that Brown's ability to conduct an effective voir dire was not hampered. However, there remains the concern

that the trial court's order negatively impacted Brown's constitutional right to the presumption of innocence. In a similar situation considered in *United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001), the parties knew the jurors' names but were instructed to refer to them only by numbers. On appeal, the Eighth Circuit Court of Appeals held that the district court could require the use of numbers for identification in any case; still, the court considered the comments of the trial court which had explained to the jury panel that the procedure of referring to them by numbers was "being employed to reduce the possibility that the media or others interested in the issues of this case might try to contact them." 250 F.3d at 635. The *Peoples* court found no error, holding that this explanation "was reasonably calculated to ensure that the use of numbers did not cause undue prejudice." 250 F.3d at 636.

Another case particularly on point is *State v. Tucker*, 259 Wis. 2d 484, 657 N.W.2d 374 (2003). In that case, the trial court ordered that jurors be referred to only by numbers during voir dire; however, the parties had access to the jurors' names. In considering whether the case truly involved an anonymous jury, the *Tucker* court stated:

"In this case, it may be more appropriate to describe the jury as a 'numbers' jury instead of an 'anonymous' jury since only the jurors' names were withheld from the record. Both parties had access to all the juror information, including the jurors' names. . . . A jury is typically deemed 'anonymous' when juror information is withheld from the public and the *parties themselves*. [Citation omitted.] Therefore, the jury in this case was not a classic 'anonymous' jury. Notwithstanding whether the jury in this case is characterized as an 'anonymous' or a 'numbers' jury, if restrictions are placed on juror identification or information, due process concerns are raised regarding a defendant's rights to an impartial jury and a presumption of innocence. Accordingly, although this case does not deal with the classic 'anonymous' jury, the reasoning in cases involving anonymous juries is beneficial to our analysis." 259 Wis. 2d at 493.

The *Tucker* court concluded:

"[T]he restriction of juror information raises serious concerns regarding a defendant's rights to an impartial jury and a presumption of innocence. Accordingly, we uphold the two-prong test . . . and conclude that if a court withholds any juror information, it must both: (1) find that a jury needs protection; and (2) take reasonable precautions to avoid prejudicing the defendant." 259 Wis. 2d at 498.

The court next reviewed the trial court's decision, finding that the trial court had failed both prongs of the test. With regard to the second prong of the test, the *Tucker* court held: "When jurors' names are withheld, as in this case, the circuit court, at a minimum, must make a precautionary statement to the jury that the use of numbers instead of names should in no way be interpreted as a reflection of the defendant's guilt or innocence." 259 Wis. 2d at 499-500. The court found that giving only general instructions on the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt was not sufficient. 259 Wis. 2d at 499.

We find this analysis persuasive and hold that when a trial court takes the unusual step of withholding jurors' names and using numbers for juror identification, a two-part test should be applied to strike a reasonable balance between the need to ensure juror safety and the defendant's right to a fair trial. First, there must be a reason to protect the jurors from identification. This decision will be left to the trial court's discretion. Second, the court must take reasonable precautions to minimize any prejudicial effects on the defendant. A neutral explanation should be given, and the jury should be instructed that the use of numbers instead of names should in no way be interpreted as a reflection of the defendant's guilt or innocence.

In this case, the State argues that the trial court had ample reason to be concerned about juror safety, given Brown's behavior in the weeks leading up to the trial. Brown was a management problem in both the county jail and in Larned State Security Hospital during his stay there for a competency evaluation. The sheriff's department had limited Brown's jail visits and phone calls in the weeks leading up to trial because of threats concerning witnesses contained in some of Brown's outgoing correspondence. At a pretrial hearing where defense counsel raised the issue of the revocation of Brown's visitation privileges, Brown became unruly and then left the courtroom. Then, the trial court received information that, on the night before the trial was to begin, a witness had been threatened by a telephone call.

These facts do not rise to the same level as the facts of many of the federal cases involving anonymous juries where defendants were involved in organized crime and witnesses had been murdered. See *Paccione*, 949 F.2d 1183; *Krout*, 66 F.3d 1420; *Crockett*, 979 F.2d 1204. However, other factors enumerated in those cases are present in this case. Brown had made threats against witnesses in outgoing correspondence from the jail, someone else had threatened a witness the night before trial, and Brown potentially faced a lengthy incarceration if convicted of the murder charge. Several cases have approved the use of anonymous juries because of the presence of some combination of these factors. *E.g.*, *United States v. Edmond*, 52 F.3d 1080, 1091 (D.C. Cir. 1995); *Ross*, 33 F.2d at 1520-21. We conclude that the trial court did not abuse its discretion in taking steps to limit identification of the jurors in this case.

More troubling, however, is the second prong of the test: Did the trial court take reasonable precautions to avoid prejudicing the substantial rights of the defendant? The State contends that the trial court's comments were similar to the comments made by the judge in *State v. Gadelkarim*, 256 Kan. 671, 887 P.2d 88 (1994). In that case, the judge informed prospective jurors that he would reveal only the streets where they lived but not their house numbers. He explained that he used this procedure to alleviate any apprehension jurors might have about serving in a criminal case. Gadelkarim argued these remarks caused jurors to fear retaliation and suggested the jury should convict Gadelkarim to insure he remained incarcerated.

The *Gadelkarim* court disagreed, finding Gadelkarim had failed to establish that the trial court's comments prejudiced his rights or had any effect on the jury. The court found nothing in the record to show that the trial court's remarks incited the jury or affected the jury's impartiality. The court stated: "Taken in context, the court's statements were clearly designed to assuage any potential discomfort the prospective jurors may have had with the voir dire process." 256 Kan. at 678.

The State points out that, in this case, the trial court did not accuse Brown of being involved in threatening witnesses nor did

the court single out Brown in announcing who was responsible for keeping the identities of the jurors secret.

Nonetheless, this case is quite different from *Gadelkarim*. In *Gadelkarim*, the trial court's comments indicated to the jury that the procedure of not revealing house numbers was commonly used. The judge told the jury that "there had never been any repercussions and . . . he wanted to be considerate of the jurors." 256 Kan. at 678. In this case, the jurors were not told that referring to them by numbers was a commonly used procedure. Rather, the jury was informed that there were concerns about the safety and security of witnesses and that the court was taking precautions out of concern for the jurors' safety. The fact that the procedure was unusual was emphasized because the procedure was instituted after jury selection. Thus, the jurors' awareness of the concern was heightened. Nothing was said to remove any stigma that might result from the announcement that concerns for safety and security led the trial court to institute special procedures. Further, when the comments are placed in the context of the arguments of the State and the testimony of the witnesses, the comments implicated Brown. Thus, a neutral explanation was not given; nor was there an additional instruction that the use of numbers for juror identification should not be interpreted as a reflection of the Brown's guilt or innocence. We hold that the comments infringed upon Brown's presumption of innocence and right to a fair trial.

Brown correctly contends that because the error affected his fundamental constitutional right to the presumption of innocence, the error should be reviewed under the constitutional harmless error rule announced in *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967). In *State v. Kleypas*, 272 Kan. 894, 1084-85, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), this court noted that the language used to express the constitutional harmless error rule in Kansas is slightly different from the language used in *Chapman*, which explicitly places the burden on the State; the standard, however, is essentially the same.

This court has stated the constitutional harmless error rule as follows:

"An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Thus, before an appellate court may declare the error harmless, it must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." *State v. Bell*, 266 Kan. 896, Syl. ¶ 9, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999).

In evaluating claims of constitutional error, this court has considered whether the evidence of guilt was of such a direct and overwhelming nature that it can be said that violation of the constitutional right could not have affected the result of the trial. See *State v. Hebert*, 277 Kan. 61, 96, 82 P.3d 470 (2004). The State contends that the evidence against Brown in this case was overwhelming; therefore, this court should find that any error was harmless. The State contends that if the jury were actually incited against Brown, surely it would have convicted him of robbery rather than the lesser included offense of attempted robbery. This argument ignores the fact that the jury did convict Brown of the most serious offense, first-degree felony murder. Also, the jury's decision to convict Brown of attempted robbery rather than robbery was almost certainly based upon the evidence that the victim's wallet was found at the scene with over $500 in cash still inside.

Additionally, the State argues that the comments at issue were made at the beginning of trial and the jury did not begin deliberations until 3 days later. However, the concerns of safety were reinforced throughout the trial by the repeated references regarding fear. As quoted earlier, the theme of fear was introduced to the jury during the prosecutor's opening statement, as the jury was told the "watchword" of the investigation was fear; the jury was told, "People fear for themselves. Fear for their families." During questioning of witnesses, there were many instances, including some not previously mentioned, where witnesses were asked if they were afraid or felt threatened. From opening statements to closing arguments, the jury was reminded of the role fear played in the investigation, and jurors were asked by the State to "be brave like the witnesses that have come forward." The trial court's statements, while not a direct comment on the evidence or credibility of any witness, certainly added weight to and made more plausible

the State's assertions regarding witness credibility and, at least potentially, left the jury with the impression that any fears felt by witnesses and used as an excuse for their lying or recalcitrance was justified because the court had also developed a sense of fear.

Given this context, can we declare beyond a reasonable doubt that the trial court's comments had little, if any, likelihood of changing the result of the trial? Certainly, there was direct evidence of Brown's guilt. Brown's palm print was found on the Wilsons' vehicle. However, the defense suggested, and the questioning of the experts could not rule out, the possibility that the palm print might have been left during a prior drug sale. Two eyewitnesses identified Brown as the shooter, and others testified that Brown had admitted to the crime. However, the credibility of each of these witnesses was attacked and none of the fact witnesses, particularly the two eyewitnesses who identified Brown as the shooter, Paula Wilson and Cameron Johnson, was an ideal witness.

Wilson's credibility largely depended upon the jury accepting the prosecutor's theme of fear. Whether the jury believed she was fearful would affect whether it accepted her initial statement that she could not identify the shooter or her later identification of Brown as the shooter.

Fifteen-year-old Johnson admitted to using alcohol and marijuana on the day of the shooting. Also, the testimony of Johnson's aunt cast some doubt on whether he could actually have seen the shooting from his location. Johnson's testimony that he was fearful of retaliation had, at the very least, the potential of making him seem more sympathetic and may have explained his demeanor or made him seem more truthful because he was willing to testify in spite of his fear.

Also, the State presented several witnesses who testified they saw Brown with a gun on the day before or the day of the shooting. However, this testimony established nothing more than the fact that Brown did have a gun. Other witnesses testified Brown admitted his involvement in the shooting. Two of these witnesses stopped short of saying Brown was the shooter, with one witness reciting only the broad statement that Brown had said he and his brother's names were "in it" and another reciting that Brown had

said "there wasn't but a couple of people there," Brown and his brother.

The credibility of another witness, David Robison, who testified that a couple of days after the shooting Brown admitted shooting the victim because he had disrespected Brown's brother, was attacked by Brown based on discrepancies between Robison's testimony and that of other witnesses identified by Robison as being present when Brown confessed. For example, Robison testified that Lashawnda Morris was present. However, Lashawnda Morris testified that the only conversation she had with Brown after the shooting was when he came to her home to get a hooded sweatshirt and shoes.

Virgil Vaughn was the other witness who testified at trial that he had heard Brown confess to shooting someone, stating he heard Brown say "he had to smoke the guy" because "he owed him some money." Vaughn testified that he overheard Brown make this statement while Brown was talking to Anthony Taylor. Vaughn had given Brown $20 for crack cocaine and was in an adjoining room waiting for the cocaine. After Brown's conversation with Taylor, Brown "ran off" with Vaughn's money. The defense argued to the jury that these statements never identified "the guy." Further, the defense pointed out that this testimony was contrary to the testimony of Anthony Taylor, who was Brown's alibi witness. Taylor, like many other witnesses in the trial, was in custody at the time of his testimony. And, in another trait common to many of the witnesses, Taylor gave testimony contrary to earlier statements. Taylor explained to the jury that he had previously lied when he gave a statement to the assistant county attorney and told the attorney that Brown had admitted shooting Doug Wilson, saying "I told them what they wanted to hear to save my own neck."

Thus, while there was direct evidence of Brown's guilt, the evidence was not overwhelming. In order for the jury to accept many aspects of the State's case, it had to resolve many credibility issues in favor of the State. Because the trial court's comments may have bolstered the State's arguments and given the impression that the witnesses had reason to fear retaliation, we cannot declare beyond

a reasonable doubt that the error arising from those comments had little, if any, likelihood of having changed the result of the trial.

Because we reach this holding, we need not address the other issues of trial error which are unlikely to occur again. The reversal of the convictions also makes moot Brown's contention that his sentence was unconstitutional.

Reversed and remanded.

GERNON, J., not participating.

LARSON, S.J., assigned.

LARSON, J., dissenting: I respectfully dissent from the decision and result reached by the majority for the following reasons:

1. The jurors were empaneled with their names known. The trial court's later designation of them by numbers did not result in their becoming an anonymous jury. For an example of a true anonymous jury, see *United States v. Peoples*, 250 F.3d 630, 635-36 (8th Cir. 2001), where names and addresses of the venire panel were known but the panel members were initially identified by numbers rather than by names. The majority's reliance on cases and articles relating to anonymous juries is not applicable to our facts and should not have been a part of its decision process.

2. The majority opinion does not make a direct finding of judicial misconduct, but the result reached is based in part on the trial judge's "safety and security" comments and his failure to make a precautionary statement to the jury that the use of numbers rather than names should in no way be interpreted as a reflection of the defendant's guilt or innocence. I do not consider the trial court's comments or action to have the effect of judicial misconduct. The majority suggestion that a neutral comment for the numbering should have been given might have required an explanation which, in fact, would not have been the actual reason for the action taken. I would not endorse such a requirement, although I agree that it

would have been a better practice to give the majority's suggested cautionary instruction. However, the failure to do so should not require reversal of the convictions and the ordering of a new trial.

There was no request for any instruction by the defendant. While this is not a jury instruction issue, the defendant's failure to make such a request must be viewed negatively to his arguments on appeal. In addition, there was no request for a mistrial and the trial judge's "safety and security" statement was not an issue in the motion for a new trial.

3. The fear which was interjected into the trial was contributed to or caused by the defendant or those acting on his behalf. To now complain about fear at the trial when it was introduced or caused by the defendant is similar in effect to the invited error rule that a litigant may not invite and lead a trial court into error and then complain of the trial court's actions on appeal. See *State v. Hebert*, 277 Kan. 61, 78, 82 P.3d 470 (2004).

The prosecution's acknowledgment of fear was necessary, as it explained changes in the testimonies of numerous witnesses. The conflict in Paula Wilson's testimony from that at the preliminary hearing was an issue to be resolved by the jury. This court has previously allowed threat testimony as being similar to incriminating circumstances of attempts to conceal or destroy evidence. See *State v. Thomas*, 252 Kan. 564, 579, 847 P.2d 1219 (1993); *State v. Williams*, 196 Kan. 628, 633, 413 P.2d 1006 (1966). There was an aura of fear in this trial, but it was properly controlled by the court's rulings. The jury was adequately instructed. The jury resolved the conflict in the testimony. As we said in *State v. Moore*, 269 Kan. 27, 30, 4 P.3d 1141 (2000): "The function of weighing the evidence and passing on credibility of witnesses belongs to the jury, not to the appellate court."

4. The wife of the victim observed the killing of her husband. She knew the shooter as the brother of her husband's drug dealer. Her explanation of earlier reluctance to identify the killer was plausible, but, again, this was an issue for the jury to resolve. There were numerous conflicts in testimony and earlier statements, but viewed in its entirety, the evidence of guilt of felony murder was overwhelming.

In making certain trial court actions reviewable on appeal despite the absence of contemporaneous objections, we have eroded the necessity of making precise, specific objections or motions at trial and deprived the trial court of the opportunity to correct errors during the trial and posttrial phases of the proceedings below.

I respectfully dissent from the majority's requirement of the convictions being reversed, the sentence being vacated, and a new trial being ordered.

I would further hold that the defendant's remaining arguments on appeal do not require reversal of the results below.

The trial court did not err in allowing the State to question witness Bennie Freeman concerning an incident between Freeman and the defendant that occurred in jail prior to Freeman's testimony. This is an issue to be viewed under an abuse of discretion standard relating to the admission of evidence once relevance was clearly shown. We have recently clarified our standard of review in *State v. Elnicki*, 279 Kan. 47, 51, 105 P.3d 1222 (2005), and *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004). In *Carter*, we said:

"An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." 278 Kan. 74, Syl. ¶ 1.

At the conclusion of the noon recess on the third day of trial, the State notified the court about alleged threats that had occurred at the jail during the recess and moved to allow certain testimony regarding the occurrence. Outside the presence of the jury, the State offered the testimony of a law enforcement officer to the effect that when the defendant became aware of Freeman's presence, he became irate and called him a "rat bastard" and a "snitch."

The trial court ruled that it would allow the testimony depending on what Freeman actually had to say. Over the defendant's objection, Freeman testified that when the defendant saw him earlier in the day, the defendant became visibly upset and called him names like "police mother fucker" and "snitch mother fucker." Freeman testified that although the defendant appeared angry, he

did not feel threatened. No other mention was made of the incident on cross-examination or on redirect examination. The trial judge then admonished the jury to disregard Freeman's testimony at the jail, saying, "After hearing the testimony, I'm not so sure what that has to do with anything that happened on November 9th, snitch, blankety blank and police blankety blank, so I want you to go ahead and disregard that and put that out of your mind, all right?"

Outside the presence of the jury, the trial judge explained, "I would have admonished the jury immediately, but I didn't want to call any more attention to it than was necessary, so—they seemed to agree with me also." Defense counsel said, "Sure," which appeared to show concurrence.

When the defendant raised this issue in his posttrial motion for a new trial, the court denied the motion but did acknowledge that with hindsight, the evidence should not have been admitted. However, the mention of the incident was brief, and the court admonished the jury to disregard it. The court also stated that based upon the jurors' facial expressions during the court's admonishment, they agreed the evidence was irrelevant.

At trial, the defendant argued the evidence of the jail incident was inadmissible because it was irrelevant and highly prejudicial. He makes the same argument on appeal, contending that evidence of the incident was not relevant to the issue of whether he committed the murder and was unfairly prejudicial in that it encouraged the jury to fear him and consider him a dangerous, threatening person.

The evidence was initially admitted because it related to the witness' state of mind and motivation, but when the witness said he did not feel threatened, the court concluded the incident had lost its relevance. Thus, the court admonished the jury to disregard the incident.

The general rule is that an admonition to the jury normally cures the prejudice from an improper admission of evidence. *State v. Gleason*, 277 Kan. 624, 642, 88 P.3d 218 (2004). *Gleason* further teaches us, citing *State v. Foster*, 259 Kan. 198, 211, 910 P.2d 848 (1996), that reversal is not required in such an instance unless the

remarks are so prejudicial as to be incurable. *Gleason*, 277 Kan. at 642. Such is not the case here. This was a very small portion of a 3-day trial, and the defendant has failed to sustain his burden that the trial court did not correctly admonish the jury to disregard this testimony.

The defendant makes a cumulative error argument, contending that even though the errors argued may be deemed harmless individually, they require reversal when viewed together. The State responds by contending no errors existed but alleges that if there were, the evidence was so overwhelming that the defendant did not sustain prejudice. The defendant does not address the weight of the evidence against him.

As has been previously stated, there was overwhelming evidence of guilt, the trial court's initial remarks concerning safety were not erroneous, and the trial court admonished the jury to disregard the yelling at the jail. Reversal is not required under a cumulative error analysis.

Finally, the defendant argues the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), was violated by sentencing him based on a criminal history score which included convictions that were not proven to a jury beyond a reasonable doubt. The defendant's issue was decided against him in *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002), which he argues was wrongly decided.

As recent as *State v. Manbeck*, 277 Kan. 224, 229-30, 83 P.3d 190 (2004), we declined to reverse *Ivory*, and we decline to do so here.

The defendant's convictions and sentence should be affirmed.

Nuss, J., joins in the forgoing dissent.

McFarland, C.J., dissenting: I join in that part of the dissent disagreeing with the majority's decision reversing the convictions. However, the reversal of the convictions makes it unnecessary to address the other claims of trial error and, therefore, I do not join in the remainder of the dissent.