Carl A. **MAJOR**, Appellant–Defendant,

v.

**STATE of Indiana**, Appellee–Plaintiff.

No. 45A03–0610–CR–483.

Court of Appeals of Indiana.

Sept. 28, 2007.

1. Crider also suggests that evidence of diminution in real estate value should have been disallowed in its entirety because of out-of-court representations by the Downens' counsel. At the damages hearing, the parties' attorneys disagreed as to the substance of the out-of-court discussion. Nevertheless, Crider made no offer of proof and we are unable to discern prejudicial error based upon the record before us.

Thomas W. Vanes, Office of the Public Defender, Crown Point, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Following a jury trial, Appellant–Defendant Carl Major appeals his convictions for three counts of Murder in the Perpetration of a Robbery, a felony,[1] and one count of Aggravated Battery as a Class B felony[2] and his corresponding aggregate sentence of 175 years. Upon appeal, Major claims the trial court erred in empaneling an anonymous jury and that his sentence was inappropriate. Concluding that the trial court erred in empaneling an anonymous jury but that such error was harmless, and further, that Major's sentence was not inappropriate, we affirm.

## FACTS

In April of 2005, David Williams and Lorna Zaber lived at 3808 Alabama Street in Hobart where Williams operated a business selling crack cocaine, and Zaber served as his delivery-person. Williams, who testified that he operated three such businesses in Hobart, believed he was taking customers away from a competitor drug dealer named "JJ" or "Jay."

On April 4, 2005, Williams and Zaber were at the Alabama Street house, as was

---

1. Ind.Code § 35–42–1–1 (2004).

2. Ind.Code § 35–42–2–1.5 (2004).

Darryl Mosley, who was twenty-two, Andrew Espinoza and Brittney Hott, who were nineteen, and Lindsay Davidson, who was twenty.

At approximately 11:00 p.m., Williams, who had heard a noise on the porch, looked through the blinds and observed two individuals. As he walked away from the door, the individuals kicked in the front door and fired shots. According to Williams, when these two individuals reached him in the back of the house, they asked where the money and "dope" were. Tr. at 1018. When Williams replied that he did not know, they began pistol-whipping him, one with a handgun, and the other with a "big gun," which looked like a semiautomatic. Tr. at 1018. After Williams gave the individuals money, they lifted him off the ground. At that point, Williams could tell that the individual with the handgun was a great deal shorter than the individual with the semiautomatic. The individuals took Williams to a bedroom so he could retrieve the drugs when, as Williams reached for the drugs, they shot him in the head, believing he was reaching for a gun.

According to Kirby Oliver, on the night of April 4, 2005, he accompanied Major and a certain Mr. Rasheed, who was noticeable for being only "about four or five feet" tall, to 3808 Alabama Street to "collect some money." Tr. at 1054, 1111. Before going, Rasheed put a vest on and grabbed the larger of two handguns. Major grabbed the second handgun, and Oliver grabbed another gun, the "biggest" of the three. Tr. at 1060. Oliver put on leather gloves, and Rasheed put on wool gloves and gave a pair to Major. The guns were placed in the trunk, and Rasheed gave the keys to Major, who drove. Rasheed was in the front passenger seat, and Oliver was in the back seat. Upon reaching Alabama Street, they pulled into

a church parking lot near Williams's house and observed the house for a couple of minutes before driving into a dark alley behind the house. The three retrieved their respective weapons from the trunk. Rasheed told the others to follow his lead, and they made their way, in a crouched position, toward the front of the house by moving up the right-hand side. According to Oliver, Rasheed stood on the porch for a couple of minutes, until Oliver joined him, while Major remained by the side of the house. Rasheed then directed Oliver to kick in the door, which he did.

According to Oliver, as Rasheed entered the house, he fired a shot, and Oliver followed him inside, also firing a shot, with Major following a few seconds behind. Oliver testified that Rasheed followed a male toward the back of the house and that Major stood with his gun displayed but did not say anything. After hearing a gunshot from the back of the house, Oliver testified that Rasheed came to the front of the house armed with a second gun, a silver pistol, which he placed in his pocket. According to Oliver, Rasheed then approached a black male, ordered him to the floor and tried to shoot him, but apparently the gun "clicked" instead. Tr. at 1079. Rasheed then exchanged guns with Major and took the black male off of the floor into the back of the house. Oliver then heard another gunshot, and Rasheed returned to the front of the house. According to Oliver, Rasheed then approached the two white females in the front of the house and shot them.

While Rasheed was shooting the females, Oliver made his way out of the house, followed by Major. Once outside the home, Oliver heard one more gunshot as he and Major headed toward their car. Upon seeing flashlights and believing police were arriving on the scene, Oliver and Major returned to the house, where they

met Rasheed, who was leaving the front porch. The three then ran through some woods and onto a street. Prior to running through the woods, Oliver lost his hat, discarded his jacket, and threw his "do-rag" in a trash can. Tr. at 1087. Oliver also threw his gun onto a woodpile, and he threw his gloves to the ground. Oliver did not see Major or Rasheed discard anything. At some point, Oliver split off from Major and Rasheed in an attempt to return to his car. The police detained him shortly thereafter.

In the early morning of April 5, 2005, Gary Police Department Officer Samuel Abegg responded to a report of the incident at 3808 Alabama by attempting to establish a perimeter. Shortly thereafter, Officer Abegg apprehended Major, whose pants were muddy, and who had a noticeably fast heart rate and was sweating in spite of the cool temperatures. Major did not resist. Major apparently called to his cohort "Jay," or "Jake," who was no longer with him and did not appear on the scene. Tr. at 920.

Hobart Police Department Officer Michael Teer testified that he was dispatched to 3808 Alabama Street while on patrol during the early morning hours of April 5, 2005. Together with Officer Bill Granzow, Officer Teer investigated the scene. Officer Granzow investigated the outside of the house while Officer Teer went inside. Upon entering the house, Officer Teer smelled a strong odor of gunpowder and observed a young man lying on his side or stomach against a couch near the north wall of the front room area. The man had been shot in the head, was breathing shallowly, and did not respond to Officer Teer. Christopher Curdes of the Hobart Fire Department, who also responded to the scene, subsequently determined that this

male, later determined to be Espinoza, was dead. Officer Teer proceeded to the dining room area of the house where he observed two white females lying on their stomachs with gunshot wounds to the back of their heads. Both females, later identified to be Hott and Davidson, were dead. Upon making his way toward the rear of the residence and hearing a male voice, Officer Teer discovered a black male in a back bedroom area, who appeared to have been shot in the head and had a lot of blood on his face. He was yelling for help. Upon walking out the back door, Officer Teer observed another male, also calling for help, who appeared to have a large bullet hole in the top of his head. These two injured men, later identified to be Williams and Mosely, survived. Williams has suffered the loss of his memory, as well as an eye and his sense of smell as a result of the shooting. He further suffers from seizures and daily headaches. Mosley, who was hospitalized for several weeks with a swollen brain and shattered facial bones, suffers from deafness in one ear and blurred vision in one eye.

Upon conducting a K–9 search of the area, police officers recovered, among other things, a black jacket, two bulletproof vests, multiple gloves (including a pair of brown gloves, a pair of black gloves, and another black glove), a black baseball cap, a "do-rag," an AR–15 assault rifle containing a live round in the chamber, a 9 mm handgun, a magazine containing twenty live 9 mm cartridges, a .380 caliber handgun, and a magazine with seven live .380 cartridges.

In statements Major made to police officers following his arrest, he admitted that he had agreed to help Rasheed "handle some business" in exchange for getting "broke off,"[3] that he knew they were go-

---

**3.** "Broke off" is jargon for "paid" according to Major. State's Exh. 1, as transcribed in

ing to commit a robbery and that it was his intention to do so, that he was wearing all black and gloves and carrying a gun, and that he guarded the door to ensure that no one left the house. State's Exh. 1.

The State charged Major with three counts of murder in the perpetration of robbery and two counts of aggravated battery. During voir dire, just prior to tendering strikes, defense counsel objected to "the local rule [4] regarding the naming of witnesses" which "prevented both counsels from ... being given the names of ... the jurors." Voir Dire Tr. 96–97. The court overruled the objection by stating,

> [O]nce again, if issues come up about improprieties with the jury, if names are required to investigate any issues with the jury, I will name those names on the record with the court administrator's office. The names are here at the bench, and the Court would be more than willing to provide names in the event that it's necessary to look into any of those matters, but at this point, your objection is noted. Overruled.

Voir Dire Tr. at 99.

Following trial, the jury found Major guilty of three counts of murder in the perpetration of robbery, three counts of Class B felony attempted robbery,[5] and of aggravated battery with respect to Mosley. The jury acquitted Major of aggravated battery with respect to Williams. At a September 19, 2006 sentencing hearing, the court merged the attempted robbery counts into the murder counts, entered judgment of conviction on the three mur-

der counts and the aggravated battery count, and sentenced Major to fifty-five years for each murder conviction and ten years for the aggravated battery conviction. The court further ordered that the terms were to be served consecutively, for an aggregate sentence of 175 years. Major now appeals.

## DISCUSSION AND DECISION

### 1. Anonymous Jury

#### a. The Merits

Major's first challenge is to the trial court's empaneling an anonymous jury. He contends that the use of an anonymous jury, especially in this case where the trial court failed to justify it, constituted an abuse of discretion and denied him certain Federal Constitutional rights, including his right to a fair trial under the Fourteenth Amendment and his right to trial by an impartial jury under the Sixth Amendment. The State responds by arguing that an anonymous jury was justified under the facts of this case. Both parties agree that this is an issue of first impression in Indiana.

■ An anonymous jury is one in which certain identifying information, particularly jurors' names, is withheld from the public as well as from the parties themselves. *United States v. Crockett*, 979 F.2d 1204, 1215 n. 10 (7th Cir.1992). While it appears that there is no Indiana law on this issue, multiple federal courts and state courts, including the Seventh Circuit Court of Appeals, have considered the question of

---

Exhibit 327, p. 4.

**4.** There is nothing in the record indicating the specific content of this rule or how it was promulgated. Pursuant to Indiana Code section 33–28–6–18 (2004), the names of qualified jurors and the contents of jury qualification forms "may not be made available to the public until the period of service of those

jurors has expired, except that attorneys in any cases in which these jurors serve shall have access to the information."

**5.** The lesser included offenses of Class A and Class B felony attempted robbery were also submitted to the jury.

anonymous juries. In deeming anonymous juries to be "an extreme measure," the Seventh Circuit has observed that the empanelment of an anonymous jury implicates a defendant's Fifth Amendment right to a presumption of innocence because it " 'raises the specter that the defendant is a dangerous person from whom the jurors must be protected.' " *United States v. Mansoori,* 304 F.3d 635, 650 (7th Cir.2002) (quoting *United States v. Ross,* 33 F.3d 1507, 1519 (11th Cir.1994)); *see also United States v. Shryock,* 342 F.3d 948, 971 (9th Cir.2003); *United States v. Edmond,* 52 F.3d 1080, 1090 (D.C.Cir.1995). Many courts, including the Seventh Circuit, have also observed that empaneling an anonymous jury may interfere with a defendant's right to trial by an impartial jury under the Sixth Amendment. *Shryock,* 342 F.3d at 971; *see also Mansoori,* 304 F.3d at 650 ("Juror anonymity … deprives the defendant of information that might help him to make appropriate challenges—in particular, peremptory challenges—during jury selection."); *United States v. DiDomenico,* 78 F.3d 294, 301 (7th Cir.1996); *Edmond,* 52 F.3d at 1090. Given these constitutional implications, many courts have similarly highlighted the rare circumstances in which anonymous juries are appropriate, deeming them a "last resort," *United States v. Edwards,* 303 F.3d 606, 613 (5th Cir.2002), and a "drastic measure." *United States v. Sanchez,* 74 F.3d 562, 564 (5th Cir.1996) (quoting *United States v. Krout,* 66 F.3d 1420, 1427 (5th Cir.1995)).

In spite of these constitutional limitations, however, courts have also recognized that "neither the right to a presumption of innocence nor the right to exercise peremptory challenges is a constitutional absolute; each, at times, must yield to the legitimate demands of trial administration and court-room security so long as steps are taken to ensure that the defendant

receives a fair trial." *Mansoori,* 304 F.3d at 650; *Edmond,* 52 F.3d at 1090. Indeed, appellate courts considering the permissibility of anonymous juries have largely upheld their use. *Crockett,* 979 F.2d at 1216, *cited in United States v. Darden,* 70 F.3d 1507, 1532 (8th Cir.1995); *see also Shryock,* 342 F.3d at 971–72; *United States v. Talley,* 164 F.3d 989, 1002 (6th Cir.1999); *Edmond,* 52 F.3d at 1091; *Krout,* 66 F.3d at 1427; *Ross,* 33 F.3d at 1520; *United States v. Paccione,* 949 F.2d 1183, 1192–93 (2nd Cir.1991); *United States v. Honken,* 378 F.Supp.2d 880, 899 (N.D.Iowa 2004); *State v. Ivy,* 188 S.W.3d 132, 143–45 (Tenn.2006); *State v. Hill,* 92 Ohio St.3d 191, 749 N.E.2d 274, 278–83 (2001); *State v. Samonte,* 83 Hawai'i 507, 928 P.2d 1, 12–17 (1996); *State v. Bowles,* 530 N.W.2d 521, 529–32 (Minn.1995). *But see Mansoori,* 304 F.3d at 650–51; *Sanchez,* 74 F.3d at 564–65 (both finding anonymous juries not warranted under the facts); *State v. Brown,* 280 Kan. 65, 118 P.3d 1273, 1280–84 (2005) (finding anonymous jury was error, in spite of being warranted under the facts, due to trial court's informing jury that security concerns were at issue); *State v. Tucker,* 259 Wis.2d 484, 657 N.W.2d 374, 382 (2003) (finding trial court's failure to provide justification for semi-anonymous jury was error); and *Commonwealth v. Angiulo,* 415 Mass. 502, 615 N.E.2d 155, 171–72 (1993) (finding error due to judge's failure to handle anonymity of jurors with appropriate precautions).

In evaluating the propriety of an anonymous jury, these courts have generally relied upon the overall standard that a trial court may empanel an anonymous jury if it a) concludes there is a strong reason to believe the jury needs protection, and b) takes reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his funda-

mental rights are protected. *See Shryock*, 342 F.3d at 971; *Talley*, 164 F.3d at 1001; *Darden*, 70 F.3d at 1532; *Edmond*, 52 F.3d at 1090; *Krout*, 66 F.3d at 1427; *Ross*, 33 F.3d at 1520; *Crockett*, 979 F.2d at 1215; *Paccione*, 949 F.2d at 1192; *Ivy*, 188 S.W.3d at 144; *Brown*, 118 P.3d at 1281; *Tucker*, 657 N.W.2d at 381; *Samonte*, 928 P.2d at 14; *Bowles*, 530 N.W.2d at 530–31; and *Angiulo*, 615 N.E.2d at 171.

■ In order to determine whether a jury needs protection, trial courts may consider several factors, including (1) the defendant's involvement in organized crime; (2) his participation in a group with the capacity to harm jurors; (3) the defendant's past attempts to interfere with the judicial process; (4) the severity of the punishment that the defendant would face if convicted; and (5) whether publicity regarding the case presents the prospect that the jurors' names could become public and expose them to intimidation or harassment. *See Mansoori*, 304 F.3d at 650–51; *see also Sanchez*, 74 F.3d at 564; *Edmond*, 52 F.3d at 1091; *Krout*, 66 F.3d at 1427; *Ross*, 33 F.3d at 1520; *Paccione*, 949 F.2d at 1192.

To determine whether the trial court has taken reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected, courts have considered whether the trial court gave the jurors a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures. *See Edmond*, 52 F.3d at 1093; *Ross*, 33 F.3d at 1521–22; *Crockett*, 979 F.2d at 1216–17; *Paccione*, 949 F.2d at 1192–93.

■ "Within these parameters the decision whether or not to empanel an anonymous jury is left to the [lower] court's discretion." *Crockett*, 979 F.2d at 1215. Accordingly, we review the trial court's decision to empanel an anonymous jury for an abuse of discretion. *Id.; see Krout*, 66 F.3d at 1426 (reviewing lower court's decision to empanel an anonymous jury for abuse of discretion based upon similar standard of review in the Second, Third, Seventh, and Eleventh Circuit Courts of Appeal).

■ We first observe that given the above authority indicating the widespread approval of the use of anonymous juries so long as (a) the trial court concludes that there is a strong reason to believe that the jury needs protection; and (b) it takes reasonable precautions to minimize the potential prejudice to the defendant and ensure that his fundamental rights are protected, we conclude that Indiana law should adopt a similar position. We do so especially in light of our prior treatment of Sixth Amendment rights, finding that they are fundamental but not absolute, and that they may give way in cases in which the government has an interest in inhibiting disclosure of sensitive information. *See Williams v. State*, 690 N.E.2d 162, 167 (Ind.1997) (observing that Sixth Amendment does not prohibit the exclusion of the public from a criminal trial where the witness fears retaliation).

■ In evaluating the instant case, we observe that pursuant to the above precedent and as the State concedes, a determination as to the propriety of an anonymous jury requires judicial consideration on a case-by-case basis and is not justifiable based solely upon a local rule authorizing the wholesale use of anonymous juries. Here, the trial court provided no case or fact-specific justification in permitting the empanelment of an anonymous jury. Indeed, the court's only justification for empaneling this anonymous jury was the apparent local rule allegedly permitting Lake County juries to be anonymous, as well as

the fact that the jurors' names were available if necessary to resolve any improprieties. In light of our above standard requiring the trial court, in empaneling an anonymous jury, to make a factual determination that the jury needs protection, we conclude this was error.[6] *See Williams,* 690 N.E.2d at 169–70 (holding that additional restrictions to the unfettered access of the public and press at trial must be justified by trial court findings).

### b. Harmless Error

The State argues in the alternative that the empanelment of an anonymous jury in this case was harmless error. In making this argument, the State points to Indiana Supreme Court precedent stating that federal constitutional rights violations are subject to harmless error analysis. *See McCorker v. State,* 797 N.E.2d 257, 266 (Ind.2003) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."))

Major responds by arguing that while some federal constitutional errors are subject to harmless error analysis, "structural" constitutional errors are not subject to such analysis. The Indiana Supreme Court has acknowledged, quoting *Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct.

2045, 95 L.Ed.2d 622 (1987), that "'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.'" *Riggs v. State,* 809 N.E.2d 322, 328 (Ind.2004). The Court has further observed that, "'the right to an impartial adjudicator, be it judge or jury, is such a right.'" *Riggs,* 809 N.E.2d at 328–29 (quoting *Gray,* 481 U.S. at 668, 107 S.Ct. 2045). As Major argues, it is this right to an impartial jury which is implicated in this case, immunizing it from harmless error analysis.

We are not inclined to deem the empanelment of an anonymous jury as one of the rare structural constitutional errors immune to harmless error analysis. First of all, *most* constitutional errors are subject to harmless error analysis. *See Arizona v. Fulminante,* 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (emphasis supplied). Additionally, as the State points out, the Seventh Circuit Court of Appeals has applied a harmless error analysis to the anonymous jury question, and the Fifth Circuit Court of Appeals has suggested it may be applicable as well. *See Mansoori,* 304 F.3d at 651–52 (finding empanelment of anonymous jury was erroneous but was nevertheless harmless error); *Sanchez,* 74 F.3d at 565 (stating with respect to empanelment of anonymous jury that "in closer cases ... there might be room for a harmless error analysis").[7]

---

**6.** While the State agrees that a rule permitting the empanelment of an anonymous jury in all jury trials would not pass constitutional muster, the State points to the facts of this case in offering justification as to why an anonymous jury was warranted under these circumstances. According to the State, Major faced a potential sentence of 235 years, the case received extensive media publicity as evidenced by the parties' requested gag order and references during voir dire by the court and counsel regarding this publicity, this case involved drug dealing which bears certain similarities to organized crime, and there was

evidence of interference with judicial process due to the fact that three of the victims at issue were killed, according to the State, because they were witnesses.

We find it unnecessary to consider these factors. In light of the above standard, such post hoc justification is inadequate, and the trial court's permitting the empanelment of an anonymous jury absent a finding that the jury needs protection is error.

**7.** Both the *Mansoori* court and the *Sanchez* court endorsed the concept that harmless er-

In light of the rarity of structural errors and the precedent establishing that a harmless error analysis may be applied to the anonymous jury question, we conclude a harmless error analysis is applicable to the case at hand. When a defendant's federal constitutional rights are violated, his conviction may be sustained if such error is harmless beyond a reasonable doubt. *See McCorker*, 797 N.E.2d at 266.

Here, Major admitted to police that he accompanied Rasheed and Oliver to 3808 Alabama Street to rob it; that he was "crouched" as he approached the house; that he was armed and fully intended to commit a robbery in exchange for payment by Rasheed; that he stood guard at the door during the robbery; and that just after Rasheed had pointed a gun at someone, pulled the trigger, and it locked, he gave Rasheed his gun. Major does not dispute that it was during and as a result of this robbery that Espinoza, Hott, and Davidson were killed and Mosley was injured. A person who knowingly or intentionally aids another person to commit an offense commits that offense. *See* Ind. Code § 35–41–2–4 (2004). Given the overwhelming evidence indicating Major's guilt, most notably his repeated and detailed confessions, we conclude that any

ror analysis is applicable in "close cases," where the factors used to determine whether the jury needs protecting are "close" to justifying an anonymous jury. The *Sanchez* court declined to apply a harmless error analysis because it did not think *Sanchez* was a "close case": (1) no one alleged the defendant was involved in organized crime; (2) no one alleged the defendant participated in a group that would attempt to harm jurors; (3) although the court voiced concern, there was no evidence the defendant had attempted to interfere with the judicial process; and (4) there was no evidence that there was extensive publicity which would bring about intimidation and harassment. 74 F.3d at 565. It appears that the lower court in *Sanchez* had empaneled an anonymous jury because there would be a one-week break between jury selection and the trial, the defendant was a police officer, and the jurors might be frightened at the prospect of having a "rogue cop" on their hands. *Id.*

The *Mansoori* court acknowledged the need for a "close case" for purposes of applying harmless error analysis, but concluded it had such a case. In *Mansoori*, the defendants, who were involved in a large-scale gang-related drug operation, had the ability and incentive to threaten the jurors, but there was no showing that they were likely to act on that ability and incentive, which made the empanelment of an anonymous jury error. 304 F.3d at 651. Nevertheless, the factors demonstrated a "close case" justifying a harmless error analysis: (1) the conspiracy involved elements of organized crime; (2) the defendant was involved in distributing guns and drugs to the leader of an organized gang which had the capacity to harm the jurors; (3) the defendants faced long prison terms; and (4) there was pretrial publicity regarding the case. *Mansoori*, 304 F.3d at 651–52.

The State would argue that this too is a "close case." According to the State, Major faced a potential sentence of 235 years, the case received extensive media publicity as evidenced by the parties' requested gag order and references during voir dire by the court and counsel regarding this publicity, this case involved drug dealing which bears certain similarities to organized crime, and there was evidence of interference with judicial process due to the fact that three of the victims at issue were killed during the incident because they were witnesses. The State further refers to the prosecutor's statement that in the trial of Major's co-defendant, jurors expressed concern about their names being used.

Major claims that the facts of the case at hand do not demonstrate a "close case" because there were no findings demonstrating any of the above allegations in the record. We note, however, that in *State v. Tucker*, 259 Wis.2d 484, 657 N.W.2d 374, 382–83 (2003), and *State v. Hill*, 92 Ohio St.3d 191, 749 N.E.2d 274, 282–83 (2001), the courts considered the defendant's confession and the adequacy of voir dire respectively in conducting a harmless error analysis without determining first whether they were faced with a "close case."

additional suggestion of guilt which might have been inferred by jurors due to their anonymous empanelment would have been harmless beyond a reasonable doubt. *See State v. Tucker*, 259 Wis.2d 484, 657 N.W.2d 374, 382–83 (2003) (concluding, based upon anonymous jury analysis, that trial court's failure to determine whether jury needed protection or to take precautionary measures to minimize prejudice to defendant was nevertheless harmless error due to defendant's confession).

We additionally observe that the parties received substantial biographical and background information regarding each juror to provide for a thorough voir dire sufficient to offset the prejudice to Major of withholding their names. Apart from the lack of names, the defendant points to no part of the voir dire which was specifically lacking, and our own review of the trial transcript demonstrates to us that the voir dire was " 'searching and thorough.' " *Mansoori*, 304 F.3d at 652 (quoting *Crockett*, 979 F.2d at 1216). Major's right to an unbiased jury was thereby protected. *Id.; see also State v. Hill*, 92 Ohio St.3d 191, 749 N.E.2d 274, 282–83 (2001) (finding no error in lower court's use of anonymous jury due to the fact that voir dire was extensive). Additionally, the court instructed the jury that Major was presumed innocent and that it was the government's burden to prove him guilty beyond a reasonable doubt. *See Mansoori*, 304 F.3d at 652. Given Major's confessions, the otherwise thorough nature of the voir dire,[8] and the court's instructions regarding Major's presumption of innocence, we are convinced the error of the anonymous jury in this case was harmless.

## 2. Sentencing

■ Major also challenges the appropriateness of his aggregate sentence of 175 years, claiming that because of his alleged lesser role in the crimes, he should have received concurrent sentences rather than consecutive sentences.

Article VII, Sections 4 and 6 of the Indiana Constitution " 'authorize[ ] independent appellate review and revision of a sentence imposed by the trial court.' " *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind.2007) (quoting *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind.2006) (emphasis and internal quotations omitted)). Such appellate authority is implemented through Indiana Appellate Rule 7(B), which provides that the "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." We exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires that we give "due consideration" to that decision and because we recognize the unique perspective a trial court has when making sentencing decisions. *Stewart v. State*, 866 N.E.2d 858, 866 (Ind.Ct.App.2007). It is the defendant's burden to demonstrate that his sentence is inappropriate. *Childress*, 848 N.E.2d at 1080.

■ The "nature of the offense" portion of the standard articulated in Appellate Rule 7(B) speaks to the statutory presumptive sentence for the class of crimes to which the offense belongs. *See Corbin v. State*, 840 N.E.2d 424, 432 (Ind. Ct.App.2006). That is, the presumptive sentence is intended to be the starting

---

**8.** Major additionally points to *State v. Brown*, 280 Kan. 65, 118 P.3d 1273 (2005), for the proposition that a thorough voir dire may not cure the empanelment of an anonymous jury.

In *Brown*, however, there was not such overwhelming evidence of the defendant's guilt as there is in this case. 118 P.3d at 1284.

point for the court's consideration of the appropriate sentence for the particular crime committed. *Id.* The character of the offender portion of the standard refers to the general sentencing considerations and the relevant aggravating and mitigating circumstances. *Id.*

Major does not dispute the disturbing nature of his offenses, for which he received the presumptive [9] fifty-five years for each felony murder and ten years for the aggravated battery. Given his concession regarding the brutal nature of the crimes, and the court's imposition of the presumptive sentences on each, we conclude that the nature of the offenses does not weigh in favor of a lesser sentence.

■ Regarding the character of the offender, Major points to his alleged lesser role in the crime and his lack of a criminal history in arguing that his sentences should run concurrently. In making this argument, Major cites to *Simmons v. State*, 814 N.E.2d 670, 678 (Ind.Ct.App. 2004), *trans. denied*, and *Merlington v. State*, 814 N.E.2d 269, 273 (Ind.2004), for the proposition that a lesser role in a crime and a lack of criminal history weigh in favor of a lesser sentence. While a defendant's lesser role in a crime may be a mitigating factor in some circumstances, the fact of defendant's alleged lesser role does not carry more weight than the fact of multiple victims of a crime in justifying the imposition of consecutive sentences. Indeed, in *Simmons*, the court declined the defendant's challenge to his consecutive sentences due to the fact that there were multiple victims involved. 814

N.E.2d at 679. Further, while the Indiana Supreme Court has acknowledged the weighty nature of a lack of criminal history, it has also consistently observed the propriety of consecutive sentences when multiple victims are involved, even when a defendant lacks criminal history. *See Walton v. State*, 650 N.E.2d 1134, 1136–37 (Ind.1995); *see also Serino v. State*, 798 N.E.2d 852, 857 (Ind.2003); *O'Connell v. State*, 742 N.E.2d 943, 952 (Ind.2001). As the imposition of concurrent sentences in this case would diminish the lives of the individual victims involved, we are convinced that the consecutive nature of Major's sentence, resulting in an aggregate term of 175 years, was not inappropriate.

Having found harmless error in the trial court's empanelment of an anonymous jury, and having found that Major's aggregate 175-year sentence was not inappropriate in light of his character and the nature of his offenses, we affirm the judgment of the trial court.

The judgment of the trial court is affirmed.

NAJAM, J., and MATHIAS, J., concur.

---

9. The amended versions of Indiana Code sections 35–50–2–3 and –5 (2007) reference the "advisory" sentence, reflecting the April 25, 2005 changes made to the Indiana sentencing statutes. Since Major committed the crimes in question on April 5, 2005, before the effective date of the amendments, we apply the version of the statutes then in effect and refer instead to the presumptive sentence. *See* Ind. Code §§ 35–50–2–3 and –5 (2004).