**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 10 2012, 8:38 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GREGORY L. FUMAROLO**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW R. FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LARRY R. BUSCHE, II, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  02A03-1108-CR-418 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No.  02D04-1007-FB-117

**May 10, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

## STATEMENT OF THE CASE

Larry R. Busche II appeals his conviction and sentence for rape, a class B felony.[1]

We affirm.

## ISSUES

I.      Whether the State presented sufficient evidence to support Busche's conviction.

II.     Whether Busche was denied a fair trial when the deputy prosecutor mentioned his post-arrest silence during cross-examination and final argument.

III.    Whether Busche's sentence was inappropriate.

## FACTS

Busche and C.D. dated for approximately five years, living together during part of that time. In June of 2010, C.D. ended the relationship, causing Busche to become very upset. Busche was living across the street from C.D. at the time, and they both worked for the same company. Accordingly, they were certain to have some contact.

In the weeks after Busche and C.D.'s relationship ended, Busche sent texts to and left voice messages for C.D. telling her that he wanted to talk and be friends. On one evening after the end of the relationship and before the rape, C.D. went to Busche's parents' home for dinner. On another occasion after the breakup, C.D. spent the night at Busche's apartment; however, they slept in separate beds.

On July 21, 2010, Busche invited C.D. to come after work to his apartment to drink margaritas. Because Busche had treated her as a friend, and not a girlfriend, during

---

[1] Ind. Code § 35-42-4-1.

2

the dinner at Busche's parents' house, C.D. accepted Busche's invitation on the condition that they stay outside on Busche's patio.

C.D. went to Busche's house and sat on the patio. C.D.'s margarita kept melting, so Busche took her glass, dumped it out, and made her a new drink. Busche refilled C.D.'s glass approximately three times, but after telling Busche that the drinks were too strong, C.D. told him that she was going to leave because she had to work the next day.

Busche went into the house to watch a recording of C.D.'s favorite band. C.D. entered the house and watched the recording for about ten minutes before again saying that she had to leave. As C.D. began to move toward the door, Busche came over, stood in front of her, grabbed her arms, and told her, "You're not going anywhere." (Tr. 126). C.D. thought he was joking, but Busche's demeanor completely changed, and he said, "I'm serious." *Id.* Busche then told C.D. to remove her clothes or he would rip them off her. A scared C.D. started taking off her clothes, while Busche tugged at them.

Busche told C.D. that she was a tease that needed to be taught a lesson and that he was "going to f*** [her] up so bad [she would] never want to be with another man again." (Tr. 127). When C.D. begged Busche to "just let me go home," he repeatedly told her to "[s]hut the f*** up." (Tr. 128). Twice, he shook his fist in her face, and when she resisted, he threatened to handcuff her.

Busche forced C.D. to perform fellatio on him, and then he performed cunnilingus on her as she cried and stared at the ceiling while thinking, "God, just let this get over with so I can go home." (Tr. 130). Busche then inserted his penis into C.D.'s vagina and

began thrusting. However, he became frustrated by C.D.'s crying, and he was unable to ejaculate.

In his frustration, Busche then ordered C.D. to get dressed and leave the apartment. After C.D. dressed and headed toward the front door, Busche grabbed her, hugged her, kissed her cheek, and told her he loved her. Busche told her that she would not see him anymore because he was going to load his gun and kill himself. Busche told her not to call the police. Busche also told her that if she sent her son, J.S., to the apartment, he would kill J.S.

Busche then allowed C.D. to leave, and she went to her apartment, where she saw J.S. and his girlfriend. She told J.S. what had happened, and J.S. called the police. The police arrived at Busche's apartment and then called him and asked him to come outside. Busche complied with the request and was handcuffed. Allen County Police Department Detective Anthony Pape read Busche his rights, which Busche indicated that he understood. Busche then informed Detective Pape that he did not want to speak with Pape. Busche then slept in Detective Pape's police vehicle as the police conducted their investigation. Detective Pape did not believe that Busche was intoxicated.

A police officer took C.D. to the Sexual Assault Treatment Center, where she talked to a Sexual Assault Nurse Examiner and received an examination. The nurse documented bruises and a scratch on C.D., which seemed to have been inflicted during the time frame of the attack. Indeed, C.D. later testified that she did not have the bruises or scratch before the attack. The nurse also conducted a genital examination of C.D., and

although she found no vaginal injuries, she later testified that she was not surprised, as most rape patients do not suffer vaginal injuries.

After the incident, C.D. suffered anxiety attacks and moved in with a friend because she did not feel safe in her apartment. C.D. went on short-term disability for four weeks.

Busche was charged with rape, a class B felony, and two counts of criminal deviate conduct, also class B felonies.[2] At trial, defense counsel argued in his opening statement that C.D.'s "story has changed constantly." (Tr. 114). Defense counsel argued that C.D. told the 911 operator that Busche "raped [her], but she [said] certain things that happened and later she [said] other things happened and she [kept] changing her story, changing it all over the place." (Tr. 116). In contrast, defense counsel stated that Busche would "take the witness stand, he's going to tell you one story. [C.D.] is going to tell you a bunch of stories." (Tr. 117). Defense counsel also stated that Busche "complied with everything, he cooperated, he just didn't say anything, he chose the right to remain silent. Absolutely right to do that." (Tr. 115). On cross-examination, and again during closing argument, the deputy prosecutor questioned how Busche's statement could be consistent if there was nothing with which to compare it.

The jury found Busche guilty of rape and not guilty of the two criminal deviate conduct charges. The trial court sentenced Busche to the Department of Correction for a period of ten years, with eight years executed and two years suspended to probation.

---

[2] I.C. § 35-42-4-2.

5

DECISION

1.    Sufficiency of the Evidence

Busche claims that the State failed to present sufficient evidence to support his conviction.  He contends that C.D.'s testimony was incredibly dubious, emphasizing that C.D.'s testimony was based upon "flashes of memory" rather than a "running memory" of the events.  Busche's Br. at 14-15.  He notes that C.D. used the terms "flashes" or "flashes of memory" approximately seven times during direct and cross-examination, and he argues that "testimonial evidence based upon 'flashes of memory' ought never be deemed as sufficient to support a conviction beyond a reasonable doubt."  Busche's Br. at 15.  Busche further notes that there is no evidence to corroborate C.D.'s testimony of what happened in his apartment and that C.D. "admitted to having told a number of different versions of [the] events."  *Id.*

Generally, in addressing a claim of insufficient evidence, we must consider only the probative evidence and reasonable inferences supporting the trier of fact's determination.  *Glenn v. State*, 884 N.E.2d 347, 355 (Ind. Ct. App. 2008), *trans. denied.*  We will not reweigh the evidence or assess witness credibility in reviewing the determination.  *Id.*  "Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense."  *Alvies v. State*, 905 N.E.2d 57, 61 (Ind. Ct. App. 2009).  "Not only must the fact-finder determine whom to believe, but also what portions of conflicting testimony to believe."  *In re J.L.T.*, 712 N.E.2d 7, 11 (Ind. Ct. App. 1999), *trans. denied.*  A conviction may be sustained on the

6

uncorroborated testimony of a single witness or victim. *Lay v. State*, 933 N.E.2d 38, 42 (Ind. Ct. App. 2010), *trans. denied*.

The exception to this standard of review is the "incredible dubiosity" principle, which permits an appellate court to reweigh the evidence and judge the credibility of a witness. *Gregory v. State*, 885 N.E.2d 697, 704-05 (Ind. Ct. App. 2008), *trans. denied*. This exception applies only where a sole witness presents inherently improbable and uncorroborated testimony. *Id*. at 705. For testimony to be so inherently incredible that it is disregarded based on a finding of "incredible dubiosity," the witness must present testimony that is "inherently contradictory, wholly equivocal or the result of coercion, and there must also be a complete lack of circumstantial evidence of the defendant's guilt." *Clay v. State*, 755 N.E.2d 187, 189 (Ind. 2001). Reversal under this rule is rare and applicable only where the testimony of a single witness is so convoluted and contrary that it "runs counter to human experience and that no reasonable person could believe it." *Edwards v. State*, 753 N.E.2d 618, 623 (Ind. 2001).

The "flashes" or "flashes of memory" that concern Busche were explained by C.D. on cross-examination. Initially, the following colloquy took place between defense counsel and C.D.:

Q:     [Y]ou told your version of what happened on July 21st a number of
        different times, correct?

A:     I'm sure, yes.

Q:     And have you lied about what happened to anybody?

A:     I have no reason to lie.

Q:     Okay. There wouldn't be any reason, would there?

7

A:  No.

Q:  Do you really remember what happened on July 21st, 2010?

A.  I have flashes.  I don't even remember every detail of getting ready to come here this morning.  So there's no way I'm going to remember every detail, it's flashes.

(App. 141).

Later, the following colloquy took place:

Q:  Nothing had happened at [an earlier] point right?  I mean you weren't having flashes then were you?

A:  What do you mean having flashes?

Q:  You said you couldn't remember some of the stuff that happened on July 21st.

A:  I was in trauma; I was in shock.  I don't remember every detail.  I remember flashes of the rape.  I don't remember every detail of it.

(App. 143).

While Busche appears to believe that the terms "flashes" or "flashes of memory" refer to testimony resulting from a dissociative state, it is clear from C.D.'s answers that this is not so.  When C.D. used these terms, she was not saying that the details making up the elements of the offense were fragmentary or fictional.  Instead, she was referring to her inability to remember "every detail" of the rape.  Her testimony was neither convoluted nor unreasonable, and the jury was tasked with determining the weight to be given thereto.

Our examination of the transcript discloses that as C.D. was interviewed by various parties, she emphasized different details and sometimes corrected small details.  These "different versions" of the rape were neither convoluted nor unreasonable, and

8

they were not so contradictory as to take the decision of Busche's guilt or innocence out of the purview of the jury.

In summary, we conclude that C.D.'s testimony was not incredibly dubious and that Busche's conviction of rape is supported by the evidence.[3]

2.    Post-Arrest Silence

Busche contends that the deputy prosecutor engaged in misconduct when she asked questions about his post-arrest silence on cross-examination and made a statement about the same during closing argument. Busche cites *Doyle v. Ohio*, 426 U.S. 610 (1976) and *Jones v. State*, 265 Ind. 447, 355 N.E.2d 402 (1976) in support of his argument. Both cases hold that it is improper for the State to inquire about a defendant's post-arrest silence regarding his trial claims of innocence, as to do so is to use his exercise of *Miranda* rights to impeach him and cause the jury to draw an unfavorable inference as to the truth of his trial testimony. *Jones*, 355 N.E.2d at 404 (quoting *Doyle*, 426 U.S. at 617-19)).

Busche acknowledges that there was no objection to either the deputy prosecutor's questions or her statement. Accordingly, Busche argues that we should find that fundamental error has occurred. The fundamental error exception is extremely narrow. *Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002). Fundamental error is that error "which so inundates the trial as to remove its essential cloak of fairness." *Kelley v. State*,

---

[3] Busche notes the apparent inconsistency of the jury's verdicts of guilty on the rape charge and not guilty on the criminal deviate conduct charges. However, Busche recognizes that our supreme court recently reaffirmed the longstanding rule that jury verdicts "are not subject to appellate review on grounds that they are inconsistent, contradictory, or irreconcilable." *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010). Busche was "afforded protection against jury irrationality or error by [our] independent review of the sufficiency of the evidence." *See id.*

566 N.E.2d 591, 593 (Ind. Ct. App. 1991). To qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Clay v. State*, 766 N.E.2d 33, 36 (Ind. Ct. App. 2002).

Busche's defense at trial was that C.D. told different versions of the rape during the time between the rape and trial, while his version never varied. During his opening statement, defense counsel stated:

> When the police came to the apartment, [Busche] was very passive. He complied with everything, he cooperated, he just didn't say anything, he chose the right to remain silent. Absolutely right to do that . . . . [C.D.] says certain things happened and she keeps changing her story, changing all over the place . . . . [Busche] is going to take the witness stand, he's going to explain what happened and his . . . he's not going to tell different stories, he's going to tell you one story.

(Tr. 115-17).

On direct examination, Busche testified to the following in answer to a question from defense counsel about what happened at his arrest:

> [An officer] goes, I'm going to turn on this little monitor in my car, if you just give us a statement, he goes, maybe we can get this all cleared up and you can go back to bed. And I'm thinking, man, I don't think so. I said, are you even going to read me my rights first. And he goes, oh yeah, we ought to do that. And he had an officer read me my rights, and I said I choose the right to remain silent.

(Tr. 321-22).

On cross-examination, the following exchange between the deputy prosecutor and Busche occurred:

> Q:   Okay. Now when the police actually informed you that they wanted to talk to you and read you your rights, you very validly, you have an absolute right not to talk to them, without an attorney, and you exercised that right. Is that correct?

10

A.    That's right.

Q:    So after you obtained an attorney you called the police to give your side of the story.  Right?

A.    No. Was I supposed to do that?

Q:    Well, during [defense counsel's] opening statement, he said that you had been consistent in what happened from the beginning.  But is it in fact true sir that today is the first time you're telling any official what happened that day.

A:    I didn't . . . yes.

Q:    Yeah.  You didn't talk to a uniformed officer; you didn't talk to Detective Sell—

A:    Absolutely not.

Q:    You didn't give a deposition.

A:    Absolutely not.

(Tr. 334-35).

Later, during closing argument, after explaining that C.D.'s statements to numerous investigators varied on insignificant details, the deputy prosecutor stated:

> [Defense counsel] also told you in opening statements that his client's statement has been consistent from the beginning.  Well, let me make something perfectly clear.  [Busche] has an absolute right, an absolute Constitutional right guaranteed to him by the United States and the Indiana Constitutions that he did not have to speak to the police without an attorney, consulting an attorney.  He has that right.  You can't hold that against him or use that against him in any way.  However, you also can't then come in here and say, or then he can't come in here and say my client's statement has been consistent, after he's exercised that right.  There's been one time that we've heard [Busche's] version of what happened and that was today.  That was today.  So how can his statement be consistent?

(Tr. 345).

11

Although evidence of a defendant's post-Miranda silence is generally not admissible, "the defendant may open the door to its admission." *Wentz v. State*, 766 N.E.2d 351, 362 (Ind. 2002) (quoting *Vitek v. State*, 750 N.E.2d 346, 350 (Ind. 2001)). The central constitutional inquiry is the "'particular use to which the post-arrest silence is being put . . . *Doyle* does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor.'" *Willsey v. State*, 698 N.E.2d 784, 793 (Ind. 1998) (quoting *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991), *cert. denied*, 502 U.S. 831).

Here, defense counsel and Busche first mentioned Bushche's post-Miranda silence. They both emphasized that Busche had been "consistent' in his recounting of the events of July 21, 2010, even though Busche had exercised his constitutional right to not recount the events prior to trial. The deputy prosecutor was very careful to emphasize the importance of the right exercised by Busche, and she did not err in mentioning a topic that both defense counsel and Busche had already introduced. Defense counsel's and Busche's statements about consistency opened the door for the deputy prosecutor's questions and comments about the impossibility of such consistency. Accordingly, the deputy prosecutor did not engage in misconduct by asking a few brief questions and making a brief observation in final argument about such impossibility. In short, there is no error here, fundamental or otherwise.

3.    Sentencing

Busche contends that his sentence is inappropriate and should be revised. While he recognizes that the sentence imposed—ten years, with eight years executed and two years suspended to probation—is less than the advisory sentence, he believes that the sentence does not take into account his unique circumstances.[4]

The revision of a sentence is authorized by the Indiana Constitution through Indiana Appellate Rule 7(B), which provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In determining the appropriateness of a sentence, a court of review may consider any factors appearing in the record. *Schumann v. State*, 900 N.E.2d 495, 497 (Ind. Ct. App. 2009). The "nature of the offense" portion of the appropriateness review begins with the advisory sentence. *Anglemyer*, 868 N.E.2d at 491; *Richardson v. State*, 906 N.E.2d 241, 247 (Ind. Ct. App. 2009). The "character of the offender" portion of the sentence review refers to general sentencing considerations and the relevant aggravating and mitigating circumstances. *Major v. State*, 873 N.E.2d 1120, 1130 (Ind. Ct. App. 2007), *trans. denied*. A defendant bears the burden of persuading us that his sentence is inappropriate in light of both the nature of his offense and his character. *Williams v. State*, 891 N.E.2d 621, 633 (Ind. Ct. App. 2008).

---

[4] A person who commits a class B felony shall be imprisoned for a fixed term of between six and twenty years, with the advisory sentence being ten years. I.C. § 35-50-2-5. Because Indiana Code section 35-50-2-2(b) does not require a mandatory executed sentence for a class B rape conviction, Busche believes that he should have received a sentence that was suspended in its entirety.

Here, Busche emphasizes that the trial court did not find any aggravators and that it found two mitigators, Busche's lack of criminal history as a forty-six year old and Busche's consistent work history. Busche emphasizes that in *Cloum v. State*, 779 N.E.2d 84, 91 (Ind. Ct. App. 2002), we observed that "[a]lthough the sentence for a 16 year old without a criminal history may be entitled to substantial mitigation . . . the sentence for a 38 year old without so much as a single arrest on his record should be entitled to even greater mitigation . . . ." He also emphasizes that "there was a tremendous ground swell of family and community support" expressed through letters to the judge and testimony at the sentencing hearing. Busche's Br. at 24. He further emphasizes that the deputy prosecutor conceded that there is no indication that Busche would not respond affirmatively to probation and that she had recommended the imposition of the advisory ten-year sentence, with six years executed and four years suspended to probation.[5]

The circumstances listed by Busche go to his character as an offender, and they indicate that an executed sentence less than the advisory is warranted. The trial court examined the circumstances and determined that an executed sentence of two years less than the advisory should be imposed. We cannot conclude that the trial court imposed an inappropriate sentence, especially given that the nature of the offense includes Busche's threats to kill C.D.'s son and several threats of physical harm to C.D. if she resisted his advances.

---

[5] Busche also argues that we should take into account his role as the child with the power of attorney to aid his parents, who are elderly and in ill-health. However, we note that the trial court found that there were other family members to assume Busche's role in his parents' lives, a finding that Busche does not contest.

14

## CONCLUSION

The State presented sufficient evidence to support Busche's conviction, as the testimony of the sole witness, C.D., was not incredibly dubious. In addition, the deputy prosecutor's questions and comment about Busche's post-arrest silence, a topic introduced in defense counsel's opening statement and Busche's direct examination, were not erroneous, and therefore could not constitute fundamental error. Finally, the sentence imposed by the trial court was not inappropriate.

Affirmed.

NAJAM, J., and RILEY, J., concur.